**THE PEOPLE'S LAW FIRM, PLC**
Stephen D. Benedetto (Ariz. Bar No. 022349)
Heather Hamel (Ariz. Bar No. 031734)
Will Knight (Ariz. Bar No. 030514)
645 North 4th Avenue, Suite A
Phoenix, Arizona 85003
Telephone: (602) 456-1901
Facsimile: (602) 801-2834
benedetto@the-plf.com
hamel@the-plf.com
knight@the-plf.com

*Firm email for docketing purposes:*
admin@the-plf.com

[Additional Counsel cont. from on second]

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keisha Acton; Nathan Aderholdt; Britney Austin; Dominic Bonelli; Lee Percy Christian; Ryder Collins; Bruce Franks, Jr.; Jessica Gibson; Milton Hasley; Jonah Ivy; Camille Johnson; Amy Kaper; Marysa Leyva; Nathaniel Llanes; William Reed; Malyka Shively; Sarra Tekola; Ryan Tice; Brandon Valentin; and Richard Villa; individually, | Case No. |
| | **COMPLAINT** |
| | **Fed. R. Civ. P. 38(b)(1) Notice of Demand for Trial by Jury** |
| Plaintiffs, | |
| vs. | |
| Allister Adel; Tom Van Dorne; Ken Vick; Vince Goddard; Sherry Leckrone; Ryan Green; April Sponsel; Nicholas Michaud; Maricopa County, a political subdivision of the State of Arizona; | |
| City of Phoenix, a municipal corporation; Jeri Williams; Dennis Orender; Benjamin Moore; Mark Schweikert; Douglas McBride James Groat; Jeff Howell; Richard Hardy; | |

1

1  Benjamin Zamora; Jeffrey Raymond; Alex
   Volk; Joseph Crowley; George Herr;
2  Christopher Turiano; John Sticca; Charles
   Hunzinger; William Gates; Joshua Ramos;
3  Angelica Williams-Castillo; Declan
   McCarthy; Geoffrey Tucker; Mario Lozoya;
4  Juan Segura; Taylor Howe; Brian Bachorski;
   Chad Metcalf; Brandon McCombs; David
5  Arredondo; Michael Thomas; Robert Scott;
   Mykel Moller; Alan Hoelscher; Jacob Tinto;
6  Eric Zopf; Blake Merl; Joshua Beeks; Arron
   Whitlock; Timothy Lynch; Kyle Coffey;
7  Matt Morgan; Joseph Kapla; Christopher
   McNeal; Derek Pulliam; Carlos Velasquez;
8  Christopher Gallegos; Bobbi Cozad; Jamie
   Jesty; Eric Coda, and Rikki Woolgar.

9
                          Defendants.
10

11  [Additional counsel cont. from first page]

12  **MURPHY, FALCON & MURPHY**
    William Murphy, Jr. (*PHV to be filed*)
13  Malcolm Ruff (*PHV to be filed*)
    1 South Street, Suite 3000
14  Baltimore, Maryland 21202
    Telephone: (410) 539-6500
15  Facsimile: (410) 539-6599
    Billy.Murphy@MurphyFalcon.com
16  Malcolm.Ruff@MurphyFalcon.com

17  **THE TRIAL LAW FIRM, LLC**
    Mart Harris (*PHV to be filed*)
18  428 Forbes Avenue, Suite 1700
    Pittsburgh, Pennsylvania 15219
19  Telephone: (412) 588-0030
    Facsimile: (412) 265-6505
20  MH@TLawF.com

21

22

23

### PRELIMINARY STATEMENT

There are few tools as effective at suppressing dissent as the enormous power of the prosecutorial state.   This is why *political prosecutions* are a hallmark of totalitarians the world over.  And when those in power target their critics and opponents, falsely accuse them of criminal offenses, and seek to neuter their influence through wrongful criminal prosecution and incarceration, supporters of democratic values should take heed.  This is such a case.

Throughout the summer and fall of 2020, prosecutors at the Maricopa County Attorney's Office colluded with officers in the Phoenix Police Department to surveil, target, unlawfully arrest, and maliciously prosecute well-known racial justice activists in an effort to suppress the First Amendment rights of activists critical of law enforcement and to intimidate, disrupt, silence, and ultimately, incapacitate the local Movement for Black Lives.  This misconduct included falsely prosecuting Black Lives Matters protesters for participating in a non-existent criminal street gang and conspiring to fabricate evidence and after fabricating that evidence, presented it grand juries regarding this fictitious gang.

As a result of this egregious misconduct—which directly targeted the highest form of protected speech (political speech)— 39/39 criminal cases that were falsely levied against Plaintiffs and others falsely arrested.  This Complaint seeks redress for these abuses, which strike at the very heart of American democracy.

### PARTIES

#### *Plaintiffs*

1.      Plaintiff Keisha Acton is, and was at all relevant times, a resident of Maricopa County.  Ms. Acton is a lead organizer with the civil rights organization, Black

Lives Matter- Phoenix Metro. Because of her political activities, associations, and political views, she was surveilled, targeted for arrest, and unlawfully arrested by Phoenix police officers on October 3, 2020. She was then maliciously prosecuted by the Maricopa County Attorney's office. All criminal charges against her were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

2. Plaintiff Nathan Aderholdt is, and was at all relevant times, a resident of Maricopa County. Mr. Aderholdt was unlawfully arrested by Phoenix police officers on October 17, 2020, because of his political opinions and support of the Black Lives Matter movement. He was then maliciously prosecuted by the Maricopa County Attorney's office and accused of being part of a fictional criminal street gang called "ACAB," an acronym for the popular phrase "all cops are bastards." All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

3. Plaintiff Britney Austin is, and was at all relevant times, a resident of Maricopa County. Ms. Austin is a well-known activist in the Phoenix, Arizona area, and a vigorous supporter of the Black Lives Matter movement. Because of her political associations and viewpoints, she was unlawfully arrested by Phoenix police officers on October 17, 2020. She was then maliciously prosecuted by the Maricopa County Attorney's office and accused of being part of a fictional criminal street gang called "ACAB." All criminal charges against her were eventually dismissed by the State, but

4

only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

4. Plaintiff Dominic Bonelli is, and was at all relevant times, a resident of Maricopa County. Mr. Bonelli was unlawfully arrested by Phoenix police officers on October 17, 2020, because of his political opinions and support of the Black Lives Matter movement. He was then maliciously prosecuted by the Maricopa County Attorney's office and accused of being part of a fictional criminal street gang called "ACAB." All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

5. Plaintiff Lee Percy Christian is, and was at all relevant times, a resident of Maricopa County. Mr. Christian is a lead organizer with Black Lives Matter-Phoenix Metro. He participated in numerous First Amendment assemblies throughout 2020 to call for an end to racialized police brutality. Because of his political activities, affiliations, and beliefs, Mr. Christian was surveilled by the Phoenix Police Department, and unlawfully arrested on July 18, 2020 and October 3, 2020. He was then maliciously prosecuted by the Maricopa County Attorney's Office, who filed gang sentencing enhancements against him in one of his criminal cases. All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

6. Plaintiff Ryder Collins is, and was at all relevant times, a resident of

Maricopa County.  Mr. Collins is not a social justice activist or community organizer.  He is a photography hobbyist.  He was in downtown Phoenix, Arizona on the night of October 17, 2020 to take photographs during the "golden hour" when he came across a small protest that was occurring.  He followed the protest for a short time, and because of his perceived political associations, opinions, and speech, he was targeted for arrest and unlawfully arrested by Phoenix police officers.  He was then maliciously prosecuted by the Maricopa County Attorney's office and accused of being a part of a fictional criminal street gang called "ACAB."  All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

7.     Plaintiff Bruce Franks, Jr., is, and was at all relevant times, a resident of Maricopa County. Mr. Franks is a nationally-known Black Lives Matter activist and organizer.  He is also a former State Representative for the State of Missouri and an Academy Award winner for his work on the documentary short "St. Louis Superman." Mr. Franks was an avid supporter of the local-Phoenix Movement for Black Lives and participated in many First Amendment assemblies in 2020, in order to echo calls to end racialized police brutality in Arizona and nationwide.  Because of his political activities, associations, and opinions, he was surveilled by the Phoenix Police Department, targeted for arrest, and unlawfully arrested on August 9, 2020.  He was then maliciously prosecuted by the Maricopa County Attorney's office.   All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's

1  and MCAO's gross misconduct to light.

2      8.     Plaintiff Jessica Gibson is, and was at all relevant times, a resident of

3  Maricopa County. Ms. Gibson was unlawfully arrested by Phoenix police officers on

4  October 17, 2020, because of her political opinions and support of the Black Lives Matter

5  movement.  She was then maliciously prosecuted by the Maricopa County Attorney's

6  office and accused of being a part of a fictional criminal street gang called "ACAB."  All

7  criminal charges against her were eventually dismissed by the State, but only after months

8  of unnecessary litigation, vigorous public campaigning, and investigative reporting

9  brought the Phoenix Police Department's and MCAO's gross misconduct to light.

10     9.     Plaintiff Milton Hasley, hereinafter referred to by his chosen name Fe'La

11  Iniko is, and was at all relevant times, a resident of Maricopa County. Mr. Iniko is well-

12  known activist and participated in numerous First Amendment assemblies throughout 2020

13  to demand an end to police brutality and to voice his support for the Movement for Black

14  Lives.  Because of his political activities, affiliations, and beliefs, Mr. Iniko was surveilled

15  by the Phoenix Police Department, and unlawfully arrested on August 9, 2020.  He was

16  then maliciously prosecuted by the Maricopa County Attorney's Office. All criminal

17  charges against him were eventually dismissed by the State, but only after months of

18  unnecessary litigation, vigorous public campaigning, and investigative reporting brought

19  the Phoenix Police Department's and MCAO's gross misconduct to light.

20     10.    Plaintiff Jonah Ivy is, and was at all relevant times, a resident of Maricopa

21  County. Mr. Ivy is a well-known activist and participated in numerous First Amendment

22  assemblies throughout 2020 to voice his support for the Movement for Black Lives.

23  Because of his political activities, affiliations, and beliefs, Mr. Ivy was surveilled by the

Phoenix Police Department, and unlawfully arrested on July 18, 2020 and August 9, 2020. He was then maliciously prosecuted by the Maricopa County Attorney's Office. All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

11.     Plaintiff Camille Johnson is, and was at all relevant times, a resident of Maricopa County. Ms. Johnson is a social justice organizer and supports many civil rights organizations in the Phoenix-Metropolitan Valley, including Black Lives Matter Phoenix Metro.  Because of her political activities, associations, and political views, she was unlawfully arrested by Phoenix police officers on October 3, 2020.  She was then maliciously prosecuted by the Maricopa County Attorney's office, who filed gang sentencing enhancements against her in her criminal case.  All criminal charges against her were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

12.     Plaintiff Amy Kaper is, and was at all relevant times, a resident of Maricopa County. Ms. Kaper was unlawfully arrested by Phoenix police officers on October 17, 2020, because of her political opinions and support of the Black Lives Matter movement. She was then maliciously prosecuted by the Maricopa County Attorney's office and accused of being a part of a fictional criminal street gang called "ACAB."  All criminal charges against her were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

13.     Plaintiff Marysa Leyva is, and was at all relevant times, a resident of Maricopa County.  Ms. Leyva was unlawfully arrested by Phoenix police officers on October 17, 2020, because of her political opinions and support of the Black Lives Matter movement.  She was then maliciously prosecuted by the Maricopa County Attorney's office and accused of being a part of a fictional criminal street gang called "ACAB."  All criminal charges against her were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

14.     Plaintiff Nathaniel Llanes is, and was at all relevant times, a resident of Maricopa County. Mr. Llanes was unlawfully arrested by Phoenix police officers on October 17, 2020, because of his political opinions and support of the Black Lives Matter movement.  He was then maliciously prosecuted by the Maricopa County Attorney's office and accused of being a part of a fictional criminal street gang called "ACAB."  All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

15.     Plaintiff William Reed is, and was at all relevant times, a resident of Maricopa County.  Mr. Reed is a well-known activist and participated in numerous First Amendment assemblies throughout 2020 to call for an end to police brutality and to voice his support for the Movement for Black Lives.  Because of his political activities, affiliations, and beliefs, Mr. Reed was surveilled by the Phoenix Police Department, and unlawfully arrested on August 9, 2020.  He was then maliciously prosecuted by the Maricopa County Attorney's Office. All criminal charges against him were eventually

dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

16.     Plaintiff Malyka Shively is, and was at all relevant times, a resident of Maricopa County.  Ms. Shively participated in numerous First Amendment assemblies throughout 2020 to voice her support for the Movement for Black Lives.  Because of her political activities and beliefs, Ms. Shively was unlawfully arrested by Phoenix police officers on August 9, 2020.  She was then maliciously prosecuted by the Maricopa County Attorney's Office.  All criminal charges against her were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

17.     Plaintiff Sarra Tekola is, and was at all relevant times, a resident of Maricopa County.  Ms. Tekola is a well-known activist and lead organizer with Black Lives Matter-Phoenix Metro.  Because of their political activities, associations, and political views, they were unlawfully arrested by Phoenix police officers on October 3, 2020.  They were then maliciously prosecuted by the Maricopa County Attorney's office.  All criminal charges against them were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

18.     Plaintiff Ryan Tice is, and was at all relevant times, a resident of Maricopa County.  Mr. Tice is a well-known activist and participated in numerous First Amendment assemblies throughout 2020 to call for an end to police brutality and to voice his support

for the Movement for Black Lives.  Because of his political activities, affiliations, and beliefs, Mr. Tice was surveilled by the Phoenix Police Department, and unlawfully arrested on July 18, 2020.  He was then maliciously prosecuted by the Maricopa County Attorney's Office.  All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

19.     Plaintiff Brandon Valentin is, and was at all relevant times, a resident of Maricopa County.  Mr. Valentin is an avid supporter of the Movement for Black Lives. Because of his political activities, affiliations, and beliefs, Mr. Valentin was surveilled by the Phoenix Police Department, and unlawfully arrested on August 9, 2020.  He was then maliciously prosecuted by the Maricopa County Attorney's Office.  All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

20.     Plaintiff Richard Villa is, and was at all relevant times, a resident of Maricopa County.  Mr. Villa is an avid supporter of the Movement for Black Lives. Because of his political activities, associations, and political views, he was surveilled and unlawfully arrested by Phoenix police officers on August 9, 2020, and again on August 26, 2020.  He was then maliciously prosecuted by the Maricopa County Attorney's office.  All criminal charges against him were eventually dismissed by the State, but only after months of unnecessary litigation, vigorous public campaigning, and investigative reporting brought the Phoenix Police Department's and MCAO's gross misconduct to light.

### *Maricopa County Defendants*

21.     Defendant Maricopa County ("Maricopa County" or the "County") is a political subdivision of the State of Arizona that can sue and be sued in its name.  The County is under a duty to run its prosecutorial activities in a lawful manner to preserve for County residents, or those being prosecuted in Maricopa County, the rights, privileges, and immunities guaranteed and secured to them by the Constitutions and laws of the United States and the State of Arizona.  Plaintiffs sue the County both directly for their independent liability under 42 U.S.C. section 1983 ("section 1983") and vicariously for the acts and omissions of its employees undertaken during the course and scope of their employment.

22.     The Maricopa County Attorney's Office ("MCAO") is an agency of the County, and all actions of the MCAO are the legal responsibility of the County because the County has delegated its prosecutorial duties and responsibilities to MCAO, including but not limited to the responsibility for establishing and implementing policies, practices, procedures, and/or customs used by MCAO attorneys and staff employed by the County regarding the criminal prosecution of individuals.

23.     Defendant Allister Adel is, and was at all times relevant to this Complaint, the County Attorney for Maricopa County ("County Attorney Adel" or "Adel").  As such, County Attorney Adel is the policymaker for the County in the area of criminal prosecution.  Upon information and belief, County Attorney Adel actively participated in, approved, and/or ratified MCAO's decisions to bring false felony charges against Plaintiffs for their perceived and actual political associations, activities, and speech.  Upon information and belief, County Attorney Adel was also responsible for supervising and/or

training the attorneys in MCAO's First Responders Bureau ("FRB") who colluded with

Phoenix Police Officers within and outside of the Tactical Response Unit ("TRU") to

illegally target, falsely arrest, and maliciously levy and prosecute felony charges against

Plaintiffs.   County Attorney Adel's participation in the acts described in this Complaint

waived her absolute prosecutorial immunity, and her status as a "final decision maker"

gaining knowledge and approving of the individual defendants' unconstitutional course of

conduct imposes liability to the County under section 1983.  Plaintiffs sue County Attorney

Adel in her individual capacity.

24.     Defendant Tom Van Dorn is, and was at all times relevant to this complaint,

part of the MCAO Executive Leadership Team, Chief Liaison between MCAO and "First

Responders" across the Phoenix Metropolitan area, and a leader of FRB.  Tom Van Dorn

is also a former police officer with the Phoenix Police Department and worked closely with

the individually named City of Phoenix Defendants, including but not limited to members

of TRU.   Upon information and belief, Defendant Van Dorn actively participated in

MCAO's decisions to bring false felony charges against Plaintiffs for their perceived and

actual political associations, activities, and speech.   Upon information and belief,

Defendant Van Dorn was also responsible for supervising and/or training the attorneys in

FRB who colluded with Phoenix Police Officers within and outside of TRU to illegally

target, falsely arrest, and maliciously levy and prosecute felony charges against Plaintiffs.

Defendant Van Dorn's participation in the acts described in this Complaint waived his

absolute prosecutorial immunity, and his status as a "final decision maker" gaining

knowledge and approving of the individual defendants' unconstitutional course of conduct

imposes liability to the County under section 1983.   Plaintiffs sue Defendant Van Dorn in

1    his individual capacity.

2        25.    Defendant Ken Vick is, and was at all times relevant to this Complaint, part

3    of the MCAO Executive Leadership Team.   Upon information and belief, Defendant Vick

4    actively participated in MCAO's decisions to bring false felony charges against Plaintiffs

5    for their perceived and actual political associations, activities, and speech.   Upon

6    information and belief, Defendant Vick was also responsible for supervising and/or

7    training the attorneys in FRB who colluded with Phoenix Police Officers within and outside

8    of TRU to illegally target, falsely arrest, and maliciously levy and prosecute felony charges

9    against Plaintiffs.   Defendant Vick's participation in the acts described in this Complaint

10   waived his absolute prosecutorial immunity, and his status as a "final decision maker"

11   gaining knowledge and approving of the individual defendants' unconstitutional course of

12   conduct imposes liability to the County under section 1983.   Plaintiffs sue Defendant Vick

13   in his individual capacity.

14       26.    Defendant Vince Goddard was at all times relevant to this Complaint part of

15   the MCAO Executive Leadership Team and an MCAO Division Chief, overseeing

16   Defendant Sherry Leckrone and the FRB.   Upon information and belief, Defendant

17   Goddard actively participated in MCAO's decisions to bring false felony charges against

18   Plaintiffs for their perceived and actual political associations, activities, and speech.  Upon

19   information and belief, Defendant Goddard was also responsible for supervising and/or

20   training the attorneys in FRB who colluded with Phoenix Police Officers within and outside

21   of TRU to illegally target, falsely arrest, and maliciously levy and prosecute felony charges

22   against Plaintiffs.   Defendant Goddard's participation in the acts described in this

23   Complaint waived his absolute prosecutorial immunity, and his status as a "final decision

14

maker" gaining knowledge and approving of the individual defendants' unconstitutional course of conduct imposes liability to the County under section 1983.    Plaintiffs sue Defendant Goddard in his individual capacity.

27.    Defendant Sherry Leckrone was at all times relevant to this complaint part of the MCAO Executive Leadership Team, and the Bureau Chief of FRB.   Upon information and belief, Defendant Leckrone actively participated in MCAO's decisions to bring false felony charges against Plaintiffs for their perceived and actual political associations, activities, and speech.   Defendant Leckrone was also responsible for supervising and/or training the attorneys in FRB who colluded with Phoenix Police Officers within and outside of TRU to illegally target, falsely arrest, and maliciously levy and prosecute felony charges against Plaintiffs.   Defendant Leckrone's participation in the acts described in this Complaint waived her absolute prosecutorial immunity, and her status as a "final decision maker" gaining knowledge and approving of the individual defendants' unconstitutional course of conduct imposes liability to the County under section 1983. Plaintiffs sue Defendant Leckrone in her individual capacity.

28.    Defendant Ryan Green was at all relevant times a Deputy County Attorney at MCAO and part of the MCAO Executive Leadership Team.   Upon information and belief, Defendant Green actively participated in MCAO's decisions to bring false felony charges against Plaintiffs for their perceived and actual political associations, activities, and speech.  After Defendant Sponsel was placed on leave and removed as lead prosecutor from Plaintiffs' criminal cases, Defendant Green took over as prosecutor and continued to pursue these cases, even after knowing they lacked probable cause and/or were unlawful and unconstitutional prosecutions motivated by political concerns.  Defendant Green's

participation in the acts described in this Complaint waived his absolute prosecutorial immunity – and, to the extent any other defendants' "final decisionmaker" authority was delegated to him, his unconstitutional actions impose liability to the County under section 1983.  Plaintiffs sue Defendant Green in his individual capacity.

29.     Defendant April Sponsel is and was at all relevant times, a Deputy County Attorney at MCAO, working within FRB.  Defendant Sponsel was the lead prosecutor and/or was directly involved in prosecuting all of Plaintiffs' criminal cases.  Defendant Sponsel worked directly with PPD Defendants to fabricate false felony charges against Plaintiffs in order to punish them for their perceived and actual political associations, activities, and speech.   Defendant Sponsel's participation in the acts described in this Complaint waived her absolute prosecutorial immunity – and, to the extent any other defendants' "final decision maker" authority was delegated to her, her unconstitutional actions impose liability to the County under section 1983.  Plaintiffs sue Defendant Sponsel in her individual capacity.

30.     Defendant Nicholas Michaud is and was at all relevant times, a Deputy County Attorney at MCAO, working within FRB.  Defendant Michaud was either the lead prosecutor or "second chair" prosecutor on all of the cases against Plaintiffs alleged herein. Defendant Michaud worked directly with PPD Defendants, as well as with DCA Sponsel, to fabricate false felony charges against Plaintiffs in order to punish them for their perceived and actual political associations, activities, and speech.   Defendant Michaud's participation in the acts described in this Complaint waived his absolute prosecutorial immunity – and, to the extent any other defendants' "final decision maker" authority was delegated to him, his unconstitutional actions impose liability to the County under section

16

1   1983.  Plaintiffs sue Defendant Michaud in his individual capacity.

2       31.    Defendants Adel, Van Dorn, Vick, Goddard, Leckrone, Green, Sponsel, and

3   Michaud shall hereafter be referred to as the "Individual MCAO Defendants."

4       32.    Each of the Individual MCAO Defendants participated in and has

5   responsibility for the unlawful conduct that resulted in injuries to Plaintiffs by, among other

6   things, personally participating in the unlawful conduct, acting jointly or conspiring with

7   others who did so; authorizing, acquiescing in, or setting in motion policies, plans, or

8   actions that led to the unlawful conduct; failing to take action to prevent such unlawful

9   conduct; failing to maintain adequate training and supervision in deliberate indifference to

10  Plaintiffs' rights; and ratifying unlawful conduct that occurred by agents and officers under

11  their direction, supervision, and control, including failing to take remedial or disciplinary

12  action.

13      33.    Every act and omission of the Individual MCAO Defendants as detailed in

14  this Complaint was performed under the color and pretense of the Constitutions, statutes,

15  ordinances, regulations, customs, and uses of the United States of America, the State of

16  Arizona, and Maricopa County, by their authority of employees of Maricopa County, and

17  within the course and scope of their employment.

18                          ***City of Phoenix Defendants***

19      34.    Defendant City of Phoenix (the "City" or "Phoenix") is a municipal

20  corporation created, organized, and existing under the laws of the State of Arizona.  The

21  City is under a duty to run its law enforcement activities in a lawful manner to preserve the

22  peace and to preserve for its citizens the rights, privileges, and immunities guaranteed and

23  secured to them by the Constitutions and laws of the United States and the State of Arizona.

35.     The Phoenix Police Department ("PPD" or "Phoenix PD") is an agency of the City, and all actions of the PPD are the legal responsibility of the City because the City has delegated its law enforcement duties and responsibilities to PPD, including but not limited to the responsibility of establishing and implementing policies, practices, procedures and/or customs used by law enforcement officers employed by the City regarding the investigation, detention, arrest, and public relations during law enforcement operations.

36.     Defendant Jeri L. Williams ("Chief Williams") is, and was at all relevant times, the Chief of Police for the City of Phoenix Police Department.  As such, Chief Williams is the policymaker for the City in the area of law enforcement.  Upon information and belief, Chief Williams actively participated in, approved, and/or ratified PPD's decisions to surveil, target, arrest, solicit and prosecute false felony charges against Plaintiffs for their perceived and actual political associations, activities, and speech.  Upon information and belief, Chief Williams was also responsible for supervising and/or training the police officers in PPD and PPD's Tactical Response Unit ("TRU"), who colluded or conspired with to MCAO to illegally target, falsely arrest, and maliciously levy and prosecute felony charges against Plaintiffs.  Chief Williams' participation in the acts described in this Complaint exposes her to direct liability, and her status as a policymaker and "final decision maker" with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983.  Plaintiffs sue Chief Williams in her official and individual capacity.

37.     Defendant Dennis Orender is a Commander for the City of Phoenix Police Department. Commander Orender is a leader of TRU, the specialty unit within PPD

responsible for protest response.  Upon information and belief, Defendant Orender "calls the shots" on when to make arrests and of whom.  Defendant Orender ordered, approved, participated in, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Defendant Orender also participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and punish them for their perceived and actual political associations, activities, and beliefs. Defendant Orender's participation in the acts described in this Complaint exposes him to direct liability, and his status a "final decision maker" (whether original or delegated) with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983.  Plaintiffs sue Defendant Orender in his individual capacity.

38.     Defendant Benjamin Moore is a Lieutenant for the City of Phoenix Police Department and is the "Field Force Commander" for TRU.  Defendant Moore ordered, approved, participated in, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Defendant Moore also participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and punish them for their perceived and actual political associations, activities, and beliefs. Defendant Moore's participation in the acts described in this Complaint exposes him to direct liability, and his status as a "final decision maker" (whether original or delegated) with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983.  Plaintiffs sue Defendant Moore in his individual capacity.

39.     Defendant Mark Schweikert is and was at all relevant times, a Lieutenant

with the City of Phoenix Police Department.  Upon information and belief, Defendant Schweikert ordered, approved, participated in, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020. Upon information and belief, Defendant Schwiekert also participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and punish them for their perceived and actual political associations, activities, and beliefs. Defendant Schweikert's participation in the acts described in this Complaint exposes him to direct liability, and his status as a "final decision maker" (whether original or delegated) with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983.  Plaintiffs sue Defendant Schweikert in his individual capacity.

40.     Defendant Douglas McBride is and was at all relevant times, a Sergeant with the City of Phoenix Police Department.  Since at least 2019, and at all times relevant to this lawsuit, Defendant McBride was responsible for managing the team of "grenadiers" (officers armed with chemical weapons) within TRU.   Defendant Moore ordered, approved, participated in, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Defendant Moore also directly participated in the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and punish them for their perceived and actual political associations, activities, and beliefs. Defendant McBride's participation in the acts described in this Complaint exposes him to direct liability, and his status as a "final decision maker" (whether original or delegated) with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983.   Plaintiffs sue Defendant McBride in his individual capacity.

20

41.     Defendant James Groat is and was at all relevant times, a Sergeant with the City of Phoenix Police Department.  At all times relevant to this lawsuit, Defendant Groat was responsible for managing and/or supervising TRU.   Defendant Groat ordered, approved, participated in, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Groat also participated in the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and punish them for their perceived and actual political associations, activities, and beliefs. Defendant Groat's participation in the acts described in this Complaint exposes him to direct liability, and his status as a "final decision maker" (whether original or delegated) with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983.  Plaintiffs sue Defendant Groat in his individual capacity.

42.     Defendant Jeff Howell is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Defendant Howell ordered, approved, participated in, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020. Defendant Howell also participated in the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and punish them for their perceived and actual political associations, activities, and beliefs.  Defendant Howell's participation in the acts described in this Complaint exposes him to direct liability, and his status as a "final decision maker" (whether original or delegated) with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983.  Plaintiffs sue Defendant Howell in his individual capacity.

21

43.     Defendant Richard Hardy is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Hardy ordered, approved, participated in, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Defendant Hardy also participated in the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and punish them for their perceived and actual political associations, activities, and beliefs.  Defendant Hardy's participation in the acts described in this Complaint exposes him to direct liability, and his status as a "final decision maker" (whether original or delegated) with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983.  Plaintiffs sue Defendant Hardy in his individual capacity.

44.     Defendant Benjamin Zamora is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Hardy participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Defendant Zamora further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Defendant Zamora's participation in the acts described in this Complaint exposes him to direct liability, and his status as a "final decision maker" (whether original or delegated) with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983.  Plaintiffs sue Defendant Hardy in his individual capacity.

45. Defendant Jeffrey Raymond is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Raymond participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020. Defendant Raymond further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs. Defendant Raymond's participation in the acts described in this Complaint exposes him to direct liability, and his status as a "final decision maker" (whether original or delegated) with respect to the unconstitutional conduct alleged herein imposes liability to the City under section 1983. Plaintiffs sue Defendant Hardy in his individual capacity.

46. Defendant Alex Volk is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Volk participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020. Upon information and belief, Defendant Volk further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs. Plaintiffs sue Defendant Volk in his individual capacity.

47. Defendant Joseph Crowley is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with

TRU.  Upon information and belief, Defendant Crowley participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Crowley further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Crowley in his individual capacity.

48.     Defendant Charles Hunzinger is, and was at all times relevant to this Complaint, a police officer working for the City of Phoenix Police Department and its Tactical Response Unit.  Upon information and belief, Defendant Hunzinger participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Hunzinger further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Defendant Hunzinger was further involved in, participated in, and/or facilitated the false and defamatory creation of Gang Membership Identification Cards for protestors to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs. Plaintiffs sue Defendant Hunzinger in his individual capacity.

49.     Defendant George Herr is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Herr participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and

October 17, 2020.  Upon information and belief, Defendant Herr further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Herr in his individual capacity.

50.     Defendant Robert Scott is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Scott participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Scott further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Scott in his individual capacity.

51.     Defendant Joshua Ramos is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Ramos participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Ramos further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Ramos in his individual capacity.

52.     Defendant Angelica Williams-Castillo is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.   Upon information and belief, Defendant Williams-Castillo participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Williams-Castillo further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Williams-Castillo in her individual capacity.

53.     Defendant Declan McCarthy is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant McCarthy participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant McCarthy further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant McCarthy in his individual capacity.

54.     Defendant Christopher Turiano is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Turiano participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant

1    Turiano further participated in, approved, and/or ratified the fabrication of evidence against

2    Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their

3    perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant

4    Turiano in his individual capacity.

5        55.    Defendant John Sticca is, and was at all times relevant to this Complaint, a

6    police officer for the City of Phoenix Police Department, assigned to or working with TRU.

7    Upon information and belief, Defendant Sticca participated in, approved, and/or ratified

8    TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and

9    October 17, 2020.  Upon information and belief, Defendant Sticca further participated in,

10   approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their

11   criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual

12   political associations, activities, and beliefs.   Plaintiffs sue Defendant Sticca in his

13   individual capacity.

14       56.    Defendant William Gates is, and was at all times relevant to this Complaint,

15   a police officer for the City of Phoenix Police Department, assigned to or working with

16   TRU.  Upon information and belief, Defendant Gates participated in, approved, and/or

17   ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18,

18   2020 and October 17, 2020.   Upon information and belief, Defendant Gates further

19   participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to

20   aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and

21   actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Gates in his

22   individual capacity.

23       57.    Defendant Geoffrey Tucker is, and was at all times relevant to this

Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Tucker participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Tucker further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Tucker in his individual capacity.

58.     Defendant Mario Lozoya is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Lozoya participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Lozoya further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Lozoya in his individual capacity.

59.     Defendant Juan Segura is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Segura participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Segura further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their

criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Segura in his individual capacity.

60.     Defendant Taylor Howe is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Howe participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Howe further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Howe in his individual capacity.

61.     Defendant Brian Bachorski is, and was at all times relevant to this Complaint, a Sergeant/police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Bachorski participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Bachorski further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Bachorski in his individual capacity.

62.     Defendant Chad Metcalf is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with

1   TRU.  Upon information and belief, Defendant Metcalf participated in, approved, and/or

2   ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18,

3   2020 and October 17, 2020.  Upon information and belief, Defendant Metcalf further

4   participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to

5   aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and

6   actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Metcalf in his

7   individual capacity.

8          63.    Defendant Brandon McCombs is, and was at all times relevant to this

9   Complaint, a police officer for the City of Phoenix Police Department, assigned to or

10  working with TRU.  Upon information and belief, Defendant McCombs participated in,

11  approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held

12  between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant

13  McCombs further participated in, approved, and/or ratified the fabrication of evidence

14  against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for

15  their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue

16  Defendant McCombs in his individual capacity.

17         64.    Defendant David Arredondo is, and was at all times relevant to this

18  Complaint, a police officer for the City of Phoenix Police Department, assigned to or

19  working with TRU.  Upon information and belief, Defendant Arredondo participated in,

20  approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held

21  between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant

22  Arredondo further participated in, approved, and/or ratified the fabrication of evidence

23  against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for

their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Arredondo in his individual capacity.

65.    Defendant Michael Thomas is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Thomas participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Thomas further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Thomas in his individual capacity.

66.    Defendant Robert Scott is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Scott participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Scott further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Scott in his individual capacity.

67.    Defendant Mykel Moller is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Moller participated in, approved, and/or

ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Moller further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Moller in his individual capacity.

68.     Defendant Alan Hoelscher is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Hoelscher participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Hoelscher further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Hoelscher in his individual capacity.

69.     Defendant Jacob Anthony Tinto is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Tinto participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Tinto further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant

1    Tinto in his individual capacity.

2        70.    Defendant Eric Zopf is, and was at all times relevant to this Complaint, a

3    police officer for the City of Phoenix Police Department, assigned to or working with TRU.

4    Upon information and belief, Defendant Zopf participated in, approved, and/or ratified

5    TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and

6    October 17, 2020.  Upon information and belief, Defendant Zopf further participated in,

7    approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their

8    criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual

9    political associations, activities, and beliefs.  Plaintiffs sue Defendant Zopf in his individual

10   capacity.

11       71.    Defendant Blake Merl is, and was at all times relevant to this Complaint, a

12   police officer for the City of Phoenix Police Department, assigned to or working with TRU.

13   Upon information and belief, Defendant Merl participated in, approved, and/or ratified

14   TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and

15   October 17, 2020.  Upon information and belief, Defendant Merl further participated in,

16   approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their

17   criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual

18   political associations, activities, and beliefs.  Plaintiffs sue Defendant Merl in his individual

19   capacity.

20       72.    Defendant Joshua Beeks is, and was at all times relevant to this Complaint,

21   a police officer for the City of Phoenix Police Department, assigned to or working with

22   TRU.  Upon information and belief, Defendant Beeks participated in, approved, and/or

23   ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18,

33

2020 and October 17, 2020.   Upon information and belief, Defendant Beeks further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.   Plaintiffs sue Defendant Beeks in his individual capacity.

73.     Defendant Arron Whitlock is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Whitlock participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.   Upon information and belief, Defendant Whitlock further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.   Plaintiffs sue Defendant Whitlock in his individual capacity.

74.     Defendant Timothy Lynch is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Lynch participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.   Upon information and belief, Defendant Lynch further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.   Plaintiffs sue Defendant Futrell in his individual capacity.

75.     Defendant Kyle Coffey is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Coffey participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Coffey further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Coffey in his individual capacity.

76.     Defendant Matt Morgan is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Morgan participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Morgan further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Morgan in his individual capacity.

77.     Defendant Joseph Kapla is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Kapla participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Kapla further participated in,

approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.   Plaintiffs sue Defendant Kapla in his individual capacity.

78.   Defendant Christopher McNeal is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.   Upon information and belief, Defendant McNeal participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.   Upon information and belief, Defendant McNeal further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.   Plaintiffs sue Defendant McNeal in his individual capacity.

79.   Defendant Derek Pulliam is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.   Upon information and belief, Defendant Pulliam participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.   Upon information and belief, Defendant Pulliam further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.   Plaintiffs sue Defendant Pulliam in his individual capacity.

80.   Defendant Carlos Velasquez is, and was at all times relevant to this

Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Velasquez participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Velasquez further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Velasquez in his individual capacity.

81.     Defendant Christopher Gallegos is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU.  Upon information and belief, Defendant Gallegos participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Gallegos further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Gallegos in his individual capacity.

82.     Defendant Bobbi Cozad is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Cozad participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Cozad further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their

criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.   Plaintiffs sue Cozad in their individual capacity.

83.   Defendant Jamie Jesty is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Jesty participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.   Upon information and belief, Defendant Jesty further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.   Plaintiffs sue Defendant Jesty in their individual capacity.

84.   Defendant Eric Coda is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with TRU. Upon information and belief, Defendant Coda participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.   Upon information and belief, Defendant Coda further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.   Plaintiffs sue Defendant Coda in their individual capacity.

85.   Defendant Rikki Woolgar is, and was at all times relevant to this Complaint, a police officer for the City of Phoenix Police Department, assigned to or working with

TRU.  Upon information and belief, Defendant Woolgar participated in, approved, and/or ratified TRU/PPD's plans to unlawfully arrest Plaintiffs at protests held between July 18, 2020 and October 17, 2020.  Upon information and belief, Defendant Woolgar further participated in, approved, and/or ratified the fabrication of evidence against Plaintiffs to aid in their criminal prosecution and to unlawfully punish Plaintiffs for their perceived and actual political associations, activities, and beliefs.  Plaintiffs sue Defendant Woolgar in their individual capacity.

86.     Upon information and belief, there are currently unknown City of Phoenix employees who caused or contributed to Plaintiffs' injuries.  The identity and roles of these individuals are uniquely within the possession of the City of Phoenix and Plaintiffs will amend this complaint to add such responsible individuals upon discovery of their identities. Until such point, some of said individual officers have been named by way of a description of unique actions taken between July 18, 2020 and October 17, 2020.

87.     Defendants Jeri L. Williams, Douglas McBride, James Groat, Mark Schweikert, Dennis Orender, Benjamin Moore, Jeffrey Howell, Richard Hardy, Benjamin Zamora, Jeffrey Raymond, Alex Volk, Joseph Crowley, Charles Hunzinger, George Herr, Angelica Williams-Castillo, Joshua Ramos, Declan McCarthy, Christopher Turiano, John Sticca, William Gates, Geoffrey Tucker, Mario Lozoya, Juan Segura, Taylor Howe, Brian Bachorski, Chad Metcalf, Brandon McCombs, David Arredondo, Michael Thomas, Robert Scott, Mykel Moller, Alan Hoelscher, Jacob Anthony Tinto, Eric Zopf, Blake Merl, Joshua Beeks, Arron Whitlock, Timothy Lynch, Kyle Coffey, Matt Morgan, Joseph Kapla, Christopher McNeal, Derek Pulliam, Carlos Velasquez, Christopher Gallegos, Bobbi Cozad, Jamie Jesty, Eric Coda, and Rikki Woolgar shall hereafter be referred to as the

1  "Individual PPD Defendants."

2      88.    Each of the Individual PPD Defendants, and unknown officers to be named,

3  participated in and has responsibility for the unlawful conduct that resulted in injuries to

4  Plaintiffs by, among other things, personally participating in the unlawful conduct, acting

5  jointly or conspiring with others who did so; authorizing, acquiescing in, or setting in

6  motion policies, plans, or actions that led to the unlawful conduct; failing to take action to

7  prevent such unlawful conduct; failing to maintain adequate training and supervision in

8  deliberate indifference to Plaintiffs' rights; and ratifying unlawful conduct that occurred

9  by agents and officers under their direction, supervision, and control, including failing to

10  take remedial or disciplinary action.

11      89.    Every act and omission of the Individual PPD Defendants, and the

12  representatives, and agents of the City of Phoenix, detailed in this Complaint was

13  performed under the color and pretense of the Constitutions, statutes, ordinances,

14  regulations, customs, and uses of the United States of America, the State of Arizona, and

15  the City of Phoenix, by their authority as sworn officers, and within the course and scope

16  of their employment.

17                        **JURISDICTION AND VENUE**

18      90.    Plaintiffs bring this lawsuit to redress violations of, *inter alia*, 42 U.S.C. §

19  1983. Thereby this court has federal question jurisdiction pursuant to 28 U.S.C. § 1331,

20  and supplemental jurisdiction under 28 U.S.C. § 1367(a).

21      91.    The events and omissions which give rise to the claims asserted in this

22  lawsuit occurred in the geographical territory of this court, in Phoenix, Arizona. Therefore,

23  pursuant to 28 U.S.C. § 1391(b), this district court is the proper venue for this lawsuit.

92.     Defendants reside and do business in Maricopa County, Arizona. Therefore, this court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4.

93.     Plaintiffs have satisfied all necessary conditions precedent to the filing of this lawsuit.

## **GENERAL ALLEGATIONS**

### *Maricopa is on notice of a pattern and practice of unconstitutional behaviors of its attorneys*

94.     Between 2009 and 2014, then-County Attorney Andrew Thomas, in coordination with then-Sheriff Joe Arpaio, initiated a series of prosecutions against a small group of innocent government officials including a Maricopa County supervisor, four state court judges, and the state attorney general who were perceived to or did espouse speech and ideas in contravention to the desires of law enforcement.

95.     Maricopa was on notice of Mr. Thomas' unconstitutional scheme to falsely charge innocent people because they settled approximately $40,000,000.00 worth of lawsuits due to Mr. Thomas' scheme with the Sheriff's office.

96.     Maricopa was on notice of Mr. Thomas' unconstitutional scheme to falsely charge innocent people because the Arizona Supreme Court disbarred Mr. Thomas for "outrageously exploit[ing his] power, fragrantly foster[ing] fear, and disgracefully misus[ing] the law" when he conspired with the Sheriff to bring false charges against innocent people.

97.     It is reasonably foreseeable that when the final decision maker personally and publicly engages in unconstitutional behaviors, that said unconstitutional behaviors become part of the culture, custom, and formal and informal policy of the institution that individual leads and that that decision maker's subordinates will follow suit. Therefore,

1   upon information and belief, Maricopa was on notice of a need for increased training and

2   supervision over employees working within the County Attorney's office.

3       98.     Upon information and belief, instead of increasing its supervision over its

4   prosecutors, retraining its prosecutors, or in any other way ensuring that Mr. Thomas'

5   influence did not permeate the ranks of the prosecution teams in Maricopa wherein

6   unfounded and politically motivated prosecutions had become part of MCAO's policies,

7   practices, and customs – formal or informal, Maricopa did nothing.

8   ***Phoenix is on notice of a pattern and practice of unconstitutional behaviors of its
9   officers***

10      99.     In October 2014, the PPD indiscriminately and without warning or

11  justification deliberately fired "less lethal munitions" (e.g., "pepper bullets") at non-violent

12  protesters who were perceived to or did espouse speech and ideas in contravention to the

13  desires of the PPD.

14      100.    At that time, any reasonable police policy- and/or decision-makers would

15  have known that such a violent response to the peaceful exercise of First Amendment rights

16  was illegal and unconstitutional.  And all policy- and decision-makers at Phoenix were

17  well-aware of PPD's actions shortly after they occurred.  Yet, Phoenix took no steps to

18  discipline, supervise, train, or otherwise control its officers and ensure that such

19  unconstitutional conduct did not repeat in the future.

20      101.    PPD's failure to appropriately respond to the unconstitutional conduct of its

21  officers in October 2014 directly and proximately resulted in substantially similar

22  unconstitutional conduct (e.g. the mass indiscriminate use of force against peaceful

23  protestors) of its officers on or about July 8, 2016.  Again, after this incident, all policy-

and decision-makers at Phoenix were well-aware of PPD's actions shortly after they occurred, yet Phoenix took no steps to discipline, supervise, train, or otherwise control its officers and ensure that such unconstitutional conduct did not repeat in the future.

102.    Phoenix's failure to appropriately respond to the unconstitutional conduct of PPD officers in October 2014 and again on or about July 8, 2016, resulted in substantially similar unconstitutional conduct of PPD officers on or about August 22, 2017. *See Puente v. City of Phoenix, et al.* 2:18-cv-02778-JJT, in the United States District Court for the District of Arizona, incorporated herein by way of request for judicial notice. Again, after this incident, all policy- and decision-makers at Phoenix  were well-aware of PPD's actions shortly after they occurred, yet Phoenix took no steps to discipline, supervise, train, or otherwise control its officers and ensure that such unconstitutional conduct did not repeat in the future.

103.    In all three instances discussed above, Phoenix chose to ratify the unconstitutional conduct of the PPD by failing to take any steps to discipline, supervise, train, or otherwise control its officers and ensure that such unconstitutional conduct did not repeat in the future. By way of example, Phoenix had actual knowledge that PPD created a white supremacist[1] "challenge coin" commemorating their unconstitutional conduct on

---

[1] At the August 22, 2017 protest, PPD officers assigned to the Tactical Response Unit created the challenge coin depicting the man that Defendant Turiano shot in the testicles. The coin stated "Make America Great Again, One Nut at a Time" on one side, and "Good Night Left Nut" surrounding an image of Defendant Turiano's victim on the other side. A true and correct image of each side of this coin is attached to this lawsuit as Exhibit 1.

"Good Night Left Side" is a noted Nazi/Neo-Nazi phrase that "is only used as a hate symbol…by right-wing radicals as a symbol of aggression and as a threat that demonstrated their readiness to commit violence against the 'left'". See https://reportingradicalism.org/en/hate-symbols/movements/modern-racist-symbols/good-night-left-side. This prominent and widely used by Nazis slogan is typically combined with another Neo-Nazi image called a "vector" which itself uses the phase "Good Night Left Side" surrounding an act of violence committed against the "Left." This

or about August 22, 2017, yet no one within Phoenix took any steps to address or root out the celebration of Nazi/ Neo-Nazi iconography and violence against protestors within PPD. Nor did Phoenix take any measures to discipline, supervise, train, or otherwise control PPD officers to ensure such actions did not repeat in the future.

104.    Despite Phoenix's actual knowledge of white supremacist influences in PPD, for three years following such actual notice, those PPD officers (most if not all of whom were designated into a special unit, the Tactical Response Unit ("TRU")) were continually allowed to not only wear the uniform and badge of Phoenix, Arizona, but were specifically deployed to Black Lives Matter events, protests regarding police violence, and other "left leaning" First Amendment assemblies. Unsurprisingly, PPD continuously engaged in substantially similar unconstitutional conduct during and in response to such events.

105.    In or around 2019, PPD expanded began to knowingly engage in fraudulent and perjurious political prosecutions in concert with the Maricopa County Attorney's Office ("MCAO"). *See, e.g., Williams v. City of Phoenix, et al.* 2:20-cv-01367-PHX-SNB, in the United States District Court for the District of Arizona, incorporated herein by way of request for judicial notice.

106.    At all times, Phoenix and Maricopa knew that maliciously prosecuting demonstrators in retaliation for their actual and/or perceived political associations, activities, and speech, and/or in response to the peaceful exercise of First Amendment

_____

formula was precisely copied by the PPD in their creation of the challenge coin featuring Officer Turiano's victim.

These symbols have been widely circulated and appended to apparel, flags, stickers, and patches and flaunted by the Neo- Nazi movement all around the world by various white supremacist organizations. A collection of unaltered images displaying and explaining such is attached to this lawsuit as Exhibit 2.

rights was illegal and unconstitutional. Moreover, despite being on actual notice of PPD's violence and a propensity for dishonesty, and despite being on actual notice of MCAO's prosecutors propensity to pursue fraudulent claims either in coordination with PPD or at their request, neither Phoenix nor Maricopa took any steps to discipline, supervise, train, or otherwise control PPD officers or MCAO prosecutors to ensure that such actions did not repeat in the future.

107.    Since at least 2017, Maricopa began to specifically worke to hide the unconstitutional conduct of PPD by refusing to take the necessary steps to update the Rule 15 database to include certain PPD officers, including but not limited to Defendants McBride and Moore. The Rule 15 database tracks law enforcement officers who, *inter alia*, lie under oath. Upon information and belief, these described actions were designed and executed in furtherance of a conspiracy between the Defendants to engage in and cover up the unconstitutional conduct described generally within this lawsuit.

108.    Maricopa and Phoenix's failure to appropriately respond to the unconstitutional conduct and conspiracy as described (*e.g.* the mass indiscriminate use of force against peaceful protestors) resulted in substantially similar unconstitutional conduct on or about May 28 and 29, 2020. Again, after these incidents, all policy- and decision-makers at Phoenix were well-aware of PPD's actions shortly after they occurred, yet Phoenix took no steps to discipline, supervise, train, or otherwise control its officers and ensure that such unconstitutional conduct did not repeat in the future.

109.    In addition to the tacit ratification of PPD's unconstitutional conduct (*e.g.* the mass indiscriminate use of force to target a small group of lawbreakers within a larger group of innocent people), Phoenix, through Defendant Williams warned demonstrators at

the news conference that the behavior from the previous night would "not be tolerated" by Phoenix. Upon information and belief, Defendant Williams' statement referred to a brewing plan to retaliate, on a mass scale, against those using their First Amendment rights to oppose police violence, in support of the Movement for Black Lives, or to speak out against white supremacy.

110. Maricopa and Phoenix's failure to appropriately respond to the unconstitutional conduct and conspiracy as described resulted in substantially similar unconstitutional conduct on or about May 30, 2020. *See, e.g.*, *Sanchez, et al. v. City of Phoenix, et al.,* 2:21-cv-00934-SMB-CDB, in the United States District Court for the District of Arizona, incorporated herein by way of request for judicial notice (detailing not just the mass indiscriminate use of chemical weapons against non-violent crowds, but also the mass indiscriminate malicious prosecution of 124 individuals using a copy-paste template to ensure the Maricopa County Jail would accept those people who were illegally arrested).

111. The May 30, 2020 conduct was so egregious that during the initial appearances of over 100 people, the judge dismissed the charges in the presence and over the presumed opposition of MCAO attorneys assigned to the Maricopa County Jail. Therefore, Phoenix and Maricopa were on actual notice that arresting protestors without probable cause and maliciously instituting criminal proceedings against them with cut-and-paste probable cause statements in retaliation for their actual or perceived political associations, activities, and speech, was illegal and unconstitutional. Again, after this incident, all policy- and decision-makers at Phoenix and Maricopa were well-aware of PPD's and MCAO's actions shortly after they occurred, yet Phoenix and Maricopa took no

1   steps to discipline, supervise, train, or otherwise control its officers or prosecutors and

2   ensure that such unconstitutional conduct did not repeat in the future.

3       112.   In addition to the tacit ratification of PPD's unconstitutional conduct,

4   Phoenix, through Defendant Williams affirmatively ratified the May 30, 2021

5   unconstitutional conduct when she gave a public statement  on June 1, 2020, falsely

6   claiming that the arrests were lawful and appropriate, and that people arrested were

7   "absolutely there to commit crimes" or assist those who were.

8       113.   In the face of such public ratification, it is reasonably foreseeable that change

9   was needed to prevent continuing unconstitutional conduct. Rather, than overhaul their

10   departments, craft new policies, or provide new training, discipline, or supervision to their

11   employees in the wake of years of egregious and flagrant misconduct, both MCAO and

12   PPD continued their misbehavior:  Throughout the summer and fall of 2020, specialty units

13   within both organizations (TRU at PPD and the First Responders Bureau[2] at MCAO),

14   operating with the knowledge and authorization of their respective decision- and policy-

15   makers and leaders, conspired to retaliate against and/or suppress the First Amendment

16   rights of well-known activists, organizers, and advocates by manufacturing and fabricating

17   evidence to then present unfounded criminal charges to grand juries.  The customs,

18   practices, policies, and procedures of Maricopa and Phoenix directly and proximately

19   caused the constitutional violations complained of in this lawsuit as follows:

20

21   / / /

22   _____

23       [2] The First Responders' Bureau is the department within MCAO that purportedly handles cases in which first responders are victims, but it also handled all protest-related cases in 2020.

47

***July 18, 2020***

114.    On July 17, 2020, civil rights icon and United States Congressman John Lewis died. To honor Rep. Lewis' legacy of civic engagement, the W.E. Rising Project[3] posted a social media announcement about a protest scheduled for July 18, 2020, at 6:00 p.m. at Phoenix City Hall.

115.    Upon information and belief, PPD officers were monitoring this social media activity.  At approximately 3:00 p.m. on July 18, 2020, PPD officers began deploying to locations in downtown Phoenix in anticipation of the event.

116.    As the participants marched, they were surveilled and monitored both by PPD officers on the ground as well as members of PPD's Homeland Defense Bureau, operating a camera device known as "Strong Watch."

117.    Of the "several dozen" participants[4], PPD had targeted two for arrest before the protest even started:  non-party Kristen Byrd and Plaintiff Ivy.  PPD officers, including Defendants Moore and Groat, claimed to have observed both men committing "obstructing a highway or other public thoroughfare" in violation of A.R.S. § 13-2906 (a class 3 misdemeanor) at prior protests on July 13, 2020, and July 15, 2020.  However, upon information belief including but not exclusively limited to the fact that regular PPD practice is to block roadways at protests, PPD had independently blocked the roadways at the

---

[3] The W.E. Rising Project holds itself out as a group formed in Arizona in early June 2020 for the purpose of working towards systemic change in policing. *See* *https://www.facebook.com/Thewerisingproject/about*

[4] The protest size was described by media accounts as involving "several dozen people."  *See* "Four people arrested during downtown Phoenix protest on July 18," FOX10, July 19, 2020, available at:  https://www.fox10phoenix.com/news/four-people-arrested-during-downtown-phoenix-protest-on-july-18

protests that took place on July 13, 2020, and July 15, 2020.

118.   After the protest concluded, and the crowd was heading home, multiple tactical teams of PPD officers surveilled and followed a group of four men who were walking together:  non-party Byrd, along with Plaintiffs Ivy, Christian, and Tice.

119.   As the men returned to their vehicles, Defendant Moore ordered the arrests of Byrd and Ivy, and upon information and belief also ordered the arrests of Christian and Tice.  At least 13 PPD officers descended on the group, swiftly exited their vehicles, and rushed in to grab, restrain, and handcuff them:

    a.  Mr. Christian was arrested by Defendants Herr, Lynch, Jurgenson and Roberts, at the direction of Defendants Moore and Groat. These defendants knowingly provided false information to MCAO to induce the criminal prosecution of Plaintiff Christian with 1 count of Obstruction of a Public Thoroughfare; 1 count of Resisting Arrest, and 2 counts of Aggravated Assault of a Police Officer and despite the lack of probable cause, MCAO maliciously initiated and continued Plaintiff Christian's prosecution. Defendant Herr, who accused Plaintiff Christian, a black man, of assaulting him, is one of the original holders of TRU's white supremacist challenge coin.

    b.  Mr. Ivy was arrested by Defendants Whitlock and Tinto, at the direction of Defendants Moore and Groat. These defendants, in concert with Defendant Sponsel, falsely charged Mr. Ivy with 3 counts of Obstruction of a Public Thoroughfare and despite the lack of probable cause, maliciously initiated and continued Mr. Ivy's prosecution.

c.   Mr. Tice was arrested by numerous PPD officers, who in concert with Defendant Sponsel, falsely charged Mr. Tice with 1 count of Obstruction of a Public Thoroughfare; 1 count of Resisting Arrest; 1 count of Hindering Prosecution and despite the lack of probable cause, maliciously initiated and continued Mr. Tice's prosecution.

### *August 9, 2020*

120.   On or about August 9, 2020, PPD briefed its officers on Plaintiff Franks, a nationally-known Black Lives matter activist. Upon information and belief, Phoenix had been spying on Plaintiff Franks and knew he was going to be protesting in Phoenix later that evening at the "Blue Silence March."

121.   At the march, PPD officers immediately searched for Plaintiff Franks, and upon finding him and communicating that he was in a "red shirt," they tracked and monitored his movements throughout the event.

122.   Upon the protester's arrival at PPD headquarters, riot officers formed a skirmish line. Several, including Defendant Velasquez, did not activate, and upon notice, refused to activate their required body cameras.

123.   The skirmish line began walking forward, pushing and shoving protesters backwards with their riot shields.

124.   The officers continued to push protesters backwards, causing some, including Plaintiffs Franks and Reed, to be trapped between the line of police shields and the large concrete planters in front of the police headquarters.

125.   Upon information and belief, Defendant Moore then ordered the false arrest of Plaintiff Franks. Defendant Schweikert located and pointed out Plaintiff Franks to the

skirmish line, which then converged upon Plaintiff Franks and effectuated Defendant

Moore's order when Defendant Moller arrested Plaintiff Franks.

126.   Defendants Sticca and Zopf arrested without probable cause Plaintiffs Reed

and Ivy, who near Plaintiff Franks when he was arrested.

127.   Defendants Lynch and Volk followed Plaintiff Villa and arrested him

without probable cause.

128.   Shortly after these arrests, Defendant Howell and Defendant McBride

circulated was a fillable, cut-and-paste probable cause statement ("Form IV") to submit in

order to successfully charge protesters with felony rioting.

> On _____ at _____ hours, at _____, located in the City of Phoenix, Maricopa County, the defendant committed rioting by using force or violence with more than two persons by _____ (list what they did, threw rocks, fireworks, bottles etc. towards law enforcement or caused damaged to property).  This occurred after an unlawful assembly was declared and an order was given at _____ hours, by _____ serial#.  Multiple orders were given over the course of _____ hours.  The defendant continued to refuse to disperse while engaging in rioting and was arrested at _____ hours.

129.   Upon information and belief, Defendant Sponsel drafted this "Form IV" for

the PPD to use to falsely arrest protestors in retaliation for their First Amendment conduct.

Upon information and belief, this "Form IV" was used to falsely charge Plaintiffs Franks,

Reed, Ivy, and Villa. Many of these charges were so obviously deficient that they were

summarily dismissed by the court during the initial appearance.

130.   As a continuation of the Defendants' conspiracy to violate the First

Amendment rights of those who did or were perceived to have engaged in speech in

opposition to police violence and/or white supremacy and/or in support of Black Lives

Matter, PPD in agreement with Defendants Sponsel and Michaud surveilled, targeted, and

falsely arrested numerous individuals who were present at the August 9, 2020 protest:

a.  On or about August 10, 2020, Defendant Crowley falsely arrested Plaintiff

Shivley, falsely claiming that Plaintiff Shivley assaulted Defendant Cozad and falsely claiming that Plaintiff Shivley attempted to break into the Maricopa County jail.

    b.  On or about August 23, 2020, Defendant Tinto falsely arrested Plaintiff Iniko.

    c.  On or about October 3, 2020, Defendants Arredondo and Thomas falsely arrested Plaintiff Christian

***Grand Jury Presentation***

131.  On or about August 20, 2020, Defendant Michaud brought cases against Plaintiffs Franks, Ivy, Reed, Shively, and Villa to the Grand Jury.

132.  On that date, Defendant Michaud:

    a.  Fabricated evidence with Defendant Zamora that Plaintiff Franks that he resisted arrest and assaulted officers.

    b.  Fabricated evidence with Defendant Zamora that Plaintiffs were responsible for "extensive property damage," including destroying police barricades;

    c.  Fabricated evidence with Defendant Zamora that Plaintiffs were "rioting";

133.  The Grand Jury returned indictments against Plaintiffs Franks, Mr. Ivy, Mr. Reed, Shively, and Mr. Villa on the basis of the fabricated evidence/ false testimony presented to it through the actions in furtherance of the conspiracy to violate the First Amendment between the Defendants.

/ / /

***August 23, 2020***

134.    On or about August 23, 2020, non-party Suvarna Ratnam attended a protest, and was arrested for allegedly assaulting a police officer with an umbrella that was purportedly sharpened for the purpose of injuring officers.

135.    At the time of the arrest and presentation of charges against Suvarna Ratnam, the police knew that the umbrella was not modified as claimed. Eventually, the charges were dismissed with prejudice.

136.    Upon information and belief, on or about September 28, 2020, one or more of the MCAO Individual Defendants met with one or more of the PPD Defendants to develop a cohesive, yet illegal, "strategy" for all past and future cases involving protestors, as well as a protocol for effectuating false arrests and charges in order to dissuade individuals from exercising their constitutionally protected First Amendment rights, and to punish those who have exercised such rights, or were suspected to have done so, or who were expected to do so.

***October 3, 2020***

137.    On or about October 3, 2020, as a number of individuals were giving public speeches at a protest against police violence and in support of Black Lives Matter, PPD spied on, identified, and surveilled, "leaders" of Black Lives Matter, including but not limited to Plaintiffs Acton, Christian, Johnson, and Tekola.

138.    Upon information and belief, PPD used aerial drone surveillance to track the one or more Plaintiffs.

139.    Upon information and belief, PPD checked if Plaintiff Christian had "active warrants" and finding none, PPD assured that he had attended the August 9, 2020 protest.

53

PPD then identified Plaintiff Christian as a candidate for the "standard five-packer for [August 9, 2020]" and for the false arrest to occur pursuant to "protocol we talked about."

140.    Upon information and belief, the "standard five-packer" referred to the five charges levied against the August 9, 2020 protesters including Plaintiff Christian for which he was arrested on October 3, 2020 pursuant to the above mentioned "protocol."   Plaintiff Christian had committed no crimes on August 9, 2020.

141.    Upon information and belief, PPD identified Plaintiff Tekola as the "main leader [of the Black Lives Matter- Phoenix] metro group."

142.    An unknown PPD officer sent a photograph of Plaintiff Tekola to Defendant Moore, who upon information and belief had been designated by PPD and identified within PPD as "Alpha Leader," and marked Plaintiff Tekola as a "TARGET" for arrest. Plaintiff Tekola committed no crimes, PPD knew Plaintiff Tekola committed no crimes, and nonetheless, marked her for arrest anyway. In support of this plan, PPD officers were to always have "eyes" on the Plaintiffs.

143.    On October 3, 2020, at the end of the protest, the illegal agreement went into action during and for the arrests of Plaintiffs Christian, Acton, Johnson, and Tekola; Defendants McBride and Sponsel coordinated:

   a.  Plaintiff Christian was falsely arrested by Defendant Arrendo and Thomas, upon orders from Defendant Moore. Defendants Arrendo and Thomas followed Plaintiff Christian's vehicle, pulled him over and then out of the car and sent him to jail on false charges.

   b.  Plaintiffs Acton, Johnson and Tekola were each walking back to their respective vehicles when Defendants Whitlock, Raymond, Ramos, Castillo-

Williams, and Zopf surrounded them and prior to falsely charging them with crimes they did not commit:

    i. Defendant Ramos, without provocation or need, tackled Plaintiff Acton and threw her to the ground.

    ii. Defendant Turiano, without provocation or need, hit Plaintiff Acton in the face.

144. On or about October 9, 2020, Defendant Sponsel and Michaud met with Defendants Howell and Hardy to discuss the October 3, 2020 arrests, and plan further specifics for their illegal and malicious prosecution.

145. In furtherance of this plan, Defendants Sponsel and Michaud caused the October 3, 2020 Plaintiffs to be criminally "joined" with the August 9, 2020 Plaintiffs. Upon information and belief, this joinder was part of the overarching conspiracy as an attempt to group all of the protesters together in order to classify the protesters as a criminal street gang.

146. On or about October 14, 2020, Defendant Sponsel met with one or more Individual MCAO Defendants as well as one or more Individual PPD Defendants for the specific purpose of discussing "law enforcement's response to protests." Immediately following that meeting, Defendants Michaud and Hardy brought cases against Plaintiffs Acton, Christian, Johnson, and Tekola to the Grand Jury.

147. On that date, Defendant Michaud:

    a. Fabricated evidence with Defendant Hardy that Plaintiff Christian was responsible for destroying police barricades;

i.  Fabricated evidence with Defendant Hardy that that Plaintiff Christian "crossed over the barricade line" to "join the group" in front of PPD headquarters. B

ii.  Fabricated evidence with Defendant Hardy that Plaintiff Christian "grabbed onto" a woman whom PPD was trying to arrest on August 9, 2020 and as a result the woman was able to escape arrest and be at large.

iii.  Fabricated evidence with Defendant Hardy that that Plaintiff Johnson assaulted an officer by "taking like a football lineman stance."

148.   The Grand Jury returned indictments against Plaintiffs Acton, Christin, Johnson and Tekola on the basis of the false evidence/ testimony presented to it through the actions in furtherance of the conspiracy to violate the First Amendment between the Defendants.

### *October 17, 2020*

149.   Upon information and belief, one of the purposes of the conspiracy between the Defendants to prevent further First Amendment activities against needless police violence, in support of Black people, and/or against the perceived interests of white supremacy, was succeeding; community members and organizations who had been active in earlier protests largely stopped engaging in First Amendment assemblies.

150.   On or about October 17, 2020 approximately fifteen (15) people, including but not limited to Plaintiffs Aderholdt, Austin, Bonelli, Gibson, Kaper, Leyva, and Llanes gathered at University Park near Van Buren Street and 10th Avenue.

151.    Prior to any potentially criminal actions of the Plaintiffs, an arrest plan was coordinated between PPD and MCAO by way of the actions of Defendants McBride, Groat, Moore and Sponsel, to arrest and charge protesting individuals as part of a criminal street gang, in furtherance of their earlier conspiracies.

152.    After the protest began, Plaintiff Collins started following the group, including the other Plaintiffs.

153.    The group was followed by PPD both on foot and in vehicles, including but not limited to Defendants Moore, Sticca, Turiano, Gates, and Tucker.

154.    At approximately 10:34p.m, Defendant Moore called an unlawful assembly.

155.    Within approximately one (1) minute after the call of an unlawful assembly, an insufficient amount of time to allow the ordered dispersal to occur, Defendant Moore ordered a "mass arrest" of the protesters, which was accomplished by approximately 20 PPD officers surrounding the group and threatening force:

    a.   Defendants Sticca, Turiano, Gates, and Tucker circled and arrested Plaintiffs Aderholt and Austin and arrested them and charged them for crimes which they did not commit.

    b.   Defendant Lozoya and Segura "copy and pasted" all or parts of a narrative report that the group's conduct, that upon information and belief, was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest critical of law enforcement and/or in support of Black Lives and charge them with crimes irrespective of the individual actions of individual arrestees.

c.  Defendants Bachorski, McBride, and Metcalf arrested Plaintiff Bonelli and charged him with crimes which he did not commit. Defendant Metcalf then "copy and pasted" all or parts of a narrative report that the group's conduct, that upon information and belief was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest critical of law enforcement and/or in support of Black Lives and charge them with crimes irrespective of the individual actions of individual arrestees.

d.  Defendant Hoelscher arrested Plaintiff Gibson and charged her with crimes she did not commit. Upon information and belief, Defendants Hoelscher and Coffey then "copy and pasted" all or parts of a narrative report that the group's conduct, that upon information and belief, was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest critical of law enforcement and/or in support of Black Lives and charge them with crimes irrespective of the individual actions of individual arrestees.

e.  Defendant McCombs arrested Plaintiff Kaper and charged her with crimes that she did not commit.

f.  Defendant Merl arrested Plaintiff Leyva and charged her with crimes that she did not commit. Defendant Merl then "copy and pasted" all or parts of a narrative report that the group's conduct, that upon information and belief,

was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest critical of law enforcement and/or in support of Black Lives and charge them with crimes irrespective of the individual actions of individual arrestees.

g.  Defendant Beeks arrested Plaintiff Llanes and charged him with crimes that he did not commit. Defendant Beeks then "copy and pasted" all or parts of a narrative report that the group's conduct, that upon information and belief, was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest critical of law enforcement and/or in support of Black Lives and charge them with crimes irrespective of the individual actions of individual arrestees.

h.  Defendants Crowley, Volk, Herr, and Scott arrested Plaintiff Collins and charged him with crimes that he did not commit. Defendant Williams-Castillo then "copy and pasted" all or parts of a narrative report that the group's conduct, that upon information and belief, was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest critical of law enforcement and/or in support of Black Lives and charge them with crimes irrespective of the individual actions of individual arrestees.

156.  Upon information and belief, in a conversation between Defendants Moore

59

1   and Sponsel immediately following the arrests described directly above, they conspired to

2   determine the language to put in the charges and reports to be filed against these Plaintiffs

3   via "Form IV."

4       157.   In early October 2020, Defendant Sponsel discussed her intention to

5   Defendants Sherry, Leckrone, and Goddard to charge the October 17, 2020 arrestees,

6   including but not limited to Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper,

7   Leyva, and Llanes, as a criminal street gang.

8       158.   Since none of the Plaintiffs were actually in a criminal street gang, Defendant

9   Sponsel pretended they were. Upon information and belief, a knowingly unreliable

10  informant that had previously made false statements to law enforcement was the source of

11  information that all of the October 17, 2020 protestors were members of this newly-

12  invented fake criminal street gang.

13      159.   On or about October 23, 2020, Defendants Sponsel and Michaud met with

14  one or more Individual PPD Defendants, including Defendant McBride, and they all

15  specifically agreed to the criminal street gang plan, and specifically to hide their

16  informant's history of unreliability from the Grand Jury.

17      160.   On October 27, 2020, in furtherance of the conspiracy to hide the truth of

18  their informant's past, Defendant Sponsel brought cases against Plaintiffs Aderholdt,

19  Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes to the Grand Jury, knowing

20  that "ACAB" was a non-existent gang.

21      161.   Defendant Sponsel called Defendants Raymond and McBride to falsely

22  testify against Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and

23  Llanes, while hiding the unreliability of the source of much of that information from the

1    Grand Jury.

2        162.    Upon information and belief, Defendant Sponsel was aware of the substance

3    of evidence to which Defendants Raymond and McBride were to testify (because upon

4    information and belief, Defendant Sponsel pre-planned the testimony), knew the testimony

5    would be false, and nonetheless affirmatively presented such false testimony to the Grand

6    Jury:

7            a.  In furtherance of the conspiracy between the Defendants, Defendant Sponsel

8                falsely advised the Grand Jury that Plaintiffs Aderholdt, Austin, Bonelli,

9                Collins, Gibson, Kaper, Leyva, and Llanes, were members of an

10               "organization" and that this "organization" went downtown on October 17,

11               2021 "to participate in a riot."

12           b.  In furtherance of the conspiracy, Defendant Sponsel falsely advised the

13               Grand Jury that Defendant McBride as a "gang expert" to testify about gang

14               history rather than disclosing Defendant McBride as a fact witness that was

15               personally involved with the events at issue before the Grand Jury.

16           c.  In furtherance of the conspiracy, Defendant Sponsel fabricated evidence with

17               Defendant McBride he later presented that: the individuals arrested on

18               October 17, 2020 including but not limited to Plaintiffs Aderholdt, Austin,

19               Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes were members of a

20               criminal street gang called "ACAB" that was similar to, and just as organized

21               and violent as notorious gangs like the Crips, Bloods, Mexican Mafia, and

22               Hells Angels;

23           d.  In furtherance of the conspiracy, Defendant Sponsel fabricated evidence with

61

1
2
3
4
5

Defendant McBride that he later presented that: "[t]his group is specifically setting out almost on a weekly basis to disrupt police, commit violent acts of aggravated assault against police, throw incendiary devices at police. And they are talking about it, they are buying the equipment, they are bringing it to the gathering, and executing those plans."

6
7
8
9
10

e.  In furtherance of the conspiracy, Defendant Sponsel knowingly fabricated evidence with Defendant McBride that he later presented that: the ACAB criminal street gang whose members included Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes would sharpen their nails and modify umbrellas to use as weapons against police.

11
12
13

163.  The Grand Jury returned indictments against Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes for numerous misdemeanors and felonies that these individuals did not commit.

14
15
16
17
18
19
20

164.  In furtherance of the conspiracy, on or about October 31, 2020, Defendants Hunzinger and Scott attempted (but failed) to add Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes to "GangNet," a statewide database of purportedly verified gang members, falsely detailing that these Plaintiffs were members of the ACAB gang, which even though no such gang existed nor were these Plaintiffs a member of any gang at all, these Defendants portrayed these Plaintiffs as members of this "extremist" organization with "violent tendencies."

21
22
23

165.  On or about October 31, 2020, Defendants Van Dorn, Leckrone, and Sponsel (all members of MCAO Executive Leadership) met with Defendants Vick, Green, Livingston and Martin (members of the MCAO's Gang Division) to further facilitate past

62

and plan future conspiratorial actions. Each of the people in this meeting knew that the testimony regarding the ACAB gang was false, and upon information and belief, one of the Defendants pointed out the illegal nature of this meeting, their plans for the future, and the attempted cover up of what they had already done, though ultimately, the "thin blue line" prevailed, and each of the persons in this meeting resolved to stand behind the false ACAB charges against Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes.

166.    Defendant Adel communicated to the MCAO and the PPD that she was not supervising and would not supervise them, when she stated publicly on the sole basis of being told by the PPD and/or MCAO conspirators without further substantiation that:

      a. "While some will attempt to describe these defendants as 'protesters,' a grand jury found probable cause to charge this group with crimes, including the planning of violence" and

      b. "While [MCAO] fully support[s] the rights of everyone to exercise their first amendment rights, we will not allow violence to take over our streets."

167.    Knowing that Defendant Adel was not supervising their actions or scrutinizing their statements, the conspirators were emboldened:

      a. On or about November 3, 2020, MCAO Deputy County Attorney Derek Debus sent a congratulatory text message to Defendant Sponsel regarding the Grand Jury's indictment of Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes as a criminal street gang, ACAB.

      b. Defendant Sponsel did not directly respond to Mr. Debus' message, rather she asked if he was on "Signal."

168.    Upon information and belief, including but not limited to Defendant Sponsel's statement to Mr. Debus that she and other MCAO personnel used Signal because of "[t]he disappearing messages feature," Signal allows users to send and receive individual and group messages that are encrypted and may automatically delete after a short period of time.

169.    Upon information and belief, the Defendants use and/or used Signal to hide their conspiratorial conversations, and to avoid public disclosure laws. Due to the Defendants' use of Signal, many pieces of evidence have been destroyed (which was the purpose and intent of the Defendants' use of this app).

170.    As of July 9, 2021, all the prosecutions brought as referenced in this lawsuit were dismissed in favors of the Plaintiffs.

## **FIRST-FOURTH CLAIMS FOR RELIEF**

**42 U.S.C. § 1983- Monell Custom or Practice of First Amendment Retaliation**
**42 U.S.C. § 1983- Monell Failure to Train, Supervise, or Discipline**
**All Plaintiffs v. Phoenix and Maricopa**

171.    From 2009 through 2014, Maricopa's County Attorney Andrew Thomas engaged in a conspiracy with the Sheriff's office to prosecute innocent people whose speech was disfavored by law enforcement.

    a.  Maricopa paid approximately $40,000,000.00 to settle lawsuits as a result of this conspiracy.

    b.  The Arizona Supreme Court disbarred Mr. Thomas for "outrageously exploit[ing his] power, fragrantly foster[ing] fear, and disgracefully misus[ing] the law" when he conspired to bring false charges against innocent people.

64

i. Upon this information, Plaintiffs allege that Maricopa was on notice of the Maricopa County Attorney's Office ("MCAO")'s custom or policy to conspire with law enforcement to prosecute innocent people whose speech was disfavored by law enforcement.

172.    It is reasonably foreseeable that when the County Attorney, a final decision maker for Maricopa, is willing to conspire with law enforcement to prosecute innocent people whose speech was disfavored by law enforcement, that such policies or customs would permeate MCAO.

173.    Maricopa took no steps to retrain, increase supervision, or otherwise ensure that the willingness of the County Attorney to conspire with law enforcement to prosecute innocent people whose speech was disfavored by law enforcement, did not infect the MCAO as a whole.

174.    The PPD has a longstanding history of violating the first amendment rights of persons who publicly speak in support of, *inter alia*, Black Lives Matter ("BLM").

a. In October 2014, BLM was protesting PPD's actions in the killing of Rumain Brisbon and alleged that the killing was racially motivated.

ii. PPD fired pepper bullets at the protestors without justification or warning.

iii. PPD's decision to use force without warning was due to BLM's statements regarding PPD's killing of Rumain Brisbon was racially motivated, rather than any legitimate justification.

65

b.  On or about July 8, 2016, BLM was protesting the police killings of Alton Sterling and Philando Castile and alleged that the killings were racially motoivated.

    iv.  PPD used tear gas and pepper spray on the protestors without justification or warning.

    v.  PPD's decision to use force without warning was due to BLM's statements regarding the police killings of Alton Sterling and Philando Castile were racially motivated, rather than any legitimate justification.

c.  On or about August 22, 2017, ex-President Donald Trump was in Phoenix. His presence prompted a protest against him, due to his recent decision to refuse to condemn white supremacy and the racially motivated murder of BLM protester Heather Heyer.

    vi.  PPD shot chemical and "less than lethal" kinetic weapons at the protestors without justification or warning.

    vii.  PPD's decision to use force without warning was due to the nature of the protest which was to condemn white supremacy.

175.  Following PPD's actions on or about August 22, 2017, PPD officers assigned to the Tactical Response Unit ("TRU") created a "challenge coin." This coin was used as a trophy within the PPD awarded to PPD officers for their actions in the line of duty against the interests of Black people and, based on its design substantially mirroring various designs of "Good Night Left Side," is coded white supremacist language.

a. On one side of the coin was the phrase, "Make America Great Again, One Nut at a Time" encircling "Phoenix, AZ August 22, 2017."

b. On the other side of the coin was a picture of an August 22, 2017 protestor, encircled by the phrase, "Good Night Left Nut."

c. On August 22, 2017, Defendant Turiano shot a rubber bullet at a protester, which hit him in the testicles.

d. Upon information and belief, the phrase "Good Night Left Nut" was knowingly adopted and modified from the phrase "Good Night Left Side."

   1. "Good Night Left Side" is a phrase that is widely used by white supremacists all around the world as a symbol of hate and aggression.

      a. The phrase "Good Night Left [Word(s)]," when used by white supremacists, typically surrounds an image of some act of violence.

         i. This image has been widely circulated all over the world on tee-shrts, patches, stickers, and flags to support white supremacy including but not limited to Nazism. ***Exhibit 1*** to this lawsuit is a true and correct copy of numerous photographs depicting variations of the phrase

as described directly associated with numerous

other white supremacist symbols.

176.    PPD's Chief of police, Defendant Williams, was aware of the existence of the "challenge coin" and its use to celebrate and reward PPD officers, and did not reprimand, train, supervise, or otherwise investigate or address white supremacy in the PPD.

    a.  Any reasonable police chief would know that white supremacist police officers would violate the constitutional rights of Black people.

    b.  Any reasonable police chief in Phoenix Arizona would know that white supremacist PPD officers would regularly come into contact with Black people in their line of work.

    c.  Defendant Williams' deliberate decision to, despite her knowledge, ignore the risks posed by her officer's white supremacist propensities and to instead, allow those officers to respond to protests against white supremacy and/or in direct support of the interests of Black people demonstrate deliberate indifference to the constitutional rights of Black people as it is substantially certain that white supremacists would use their police powers and authority to suppress the rights of Black people or those believed to be in support of Black people.

    d.  Despite Defendant Williams' knowledge, which put Defendant Phoenix on notice, the white supremacist PPD officers were continuously deployed to protests against white supremacy and/or in direct support of the interests of Black people.

181.   Phoenix's City Manager was aware of the existence of the "challenge coin" and its use to celebrate and reward PPD officers, and did not reprimand, train, supervise, or otherwise investigate or address white supremacy in the PPD.

    a.   Any reasonable city manager would know that white supremacist police officers would violate the constitutional rights of Black people.

    b.   Any reasonable city manager in Phoenix Arizona would know that white supremacist PPD officers would regularly come into contact with Black people in their line of work.

    c.   The city manager's deliberate decision to, despite her knowledge, ignore the risks posed by his officer's white supremacist propensities and to instead, allow those officers to respond to protests against white supremacy and/or in direct support of the interests of Black people demonstrate deliberate indifference to the constitutional rights of Black people as it is substantially certain that white supremacists would use their police powers and authority to suppress the rights of Black people or those believed to be in support of Black people.

    d.   Despite the city manager's knowledge, which put Defendant Phoenix on notice, the white supremacist PPD officers were continuously deployed to protests against white supremacy and/or in direct support of the interests of Black people.

182.   Secure in the knowledge that, despite years of knowledge, the highest levels of City authority were going to do nothing in response to their known white

supremacy, PPD's actions against protesters of white supremacy and/or in direct support of the interests of Black people escalated.

 a. On or about July 12, 2019, PPD officers assigned to the same unit which created the "challenge coin" arrested Jamaar Williams. Mr. Williams is a Maricopa County Public Defender, a Black man, a prominent support of Black Lives Matter, and on the night in question, acting as a legal observer for the protest in opposition to ex-President Donald Trump's actions against primarily Hispanic people.

  i. Mr. Williams' arrest was for assaulting a police officer, an action for which he was factually innocent.

  ii. In addition to being factually innocent, PPD <u>knew</u> that Mr. Williams was factually innocent within 24 hours of the arrest.

   1. Defendant McBride identified Mr. Williams as someone to target for arrest.

   2. Defendant McBride then co-ordinated Mr. Williams' arrest using fabricated evidence that Mr. Williams assaulted a police officer.

   3. PPD officers then used that fabricated evidence, with the specific permission of Defendant Williams, to induce the Maricopa County Attorney's Office ("MCAO") to prosecute Mr. Williams for crimes he did not commit.

  iii. On or about August 22, 2019, Maricopa County Superior Court Commissioner David Seyer dismissed all the charges, upon PPD

1              officer Francisco Barrios' testimony that "that night or the next

2              morning, that there was a misidentification and Jamaar Williams did

3              not" assault an officer.

4        183.    Upon information and belief, MCAO thereafter came to an agreement with

5  the PPD in order to facilitate the continued racial targeting undertaken by PPD, to refuse

6  to perform their administrative function to place PPD officers including but not limited to

7  Defendants McBride and Moore, into the "Rule 15" database as individuals with

8  demonstrable biases or serious credibility concerns.

9         a.  As a direct and proximate result of MCAO's inaction in furtherance of its

10            agreement with PPD, numerous PPD officers assigned to the unit

11            containing white supremacists were permitted to continue working as

12            police officers.

13        184.    Secure in the knowledge that MCAO was supportive of PPD's white

14  supremacist propensities by way of their agreement, PPD and MCAO's actions against

15  protesters of white supremacy and/or in direct support of the interests of Black people

16  escalated.

17        185.    On May 25, 2020, a Black man, George Floyd was murdered by ex-

18  Minneapolis police officer Derek Chauvin.

19        186.    On May 25, 2020, a Black man, Dion Johnson was murdered by an Arizona

20  Department of Public Safety officer.

21        187.    In response to these apparently racially motivated killings, on May 28,

22  2020, thousands of protestors were in downtown Phoenix.

23

a. PPD fired numerous chemical and "non-lethal" kinetic weapons at the protestors without justification or warning.

b. PPD's decision to use force without warning was due to protestors' statements regarding the police killings of George Floyd and Dion Johnson were racially motivated, rather than any legitimate justification.

188. In further response to these apparently racially motivated killings, on May 29, 2020, protestors were again in downtown Phoenix.

a. PPD fired numerous chemical and "non-lethal" kinetic weapons at the protestors without justification or warning.

b. PPD's decision to use force without warning was due to protestors' statements regarding the police killings of George Floyd and Dion Johnson were racially motivated, rather than any legitimate justification.

189. Phoenix's Mayor and Defendant Williams held a press conference on May 30, 2020 regarding the PPD's actions of the past two nights, and therein, lied about "widespread property damage in the hundreds of thousands of dollars," which justified PPD's actions.

190. At that press conference, Defendant Williams warned that protestors engaging in similar behavior would "not be tolerated."

a. At the time of these statements, Defendant Williams and the Mayor knew that PPD's actions were not in response to violence, but actually the initial aggression, and that there was not wide-spread property damage.

b. At the time of these statements, PPD officers knew that Defendant Williams and the Mayor knew that PPD's actions were not in response to

72

1          violence, but actually the initial aggression and that there was not wide-

2          spread property damage.

3      191.    Secure in the knowledge that, despite specific knowledge contrary to their

4  statements in support of PPD's actions, the highest levels of City authority were going to

5  do nothing in response to PPD's actions against protesters of white supremacy and/or in

6  direct support of the interests of Black people, PPD's behaviors again escalated.

7      192.    On Saturday May 30, 2020, in further response to the apparently racially

8  motivated killings of George Floyd and Dion Johnson, protestors were again in

9  downtown Phoenix. In addition to the chemical and "non-lethal" kinetic weapons

10  deployed up to this point:

11        a.   PPD officers pulled people from vehicles at gunpoint.

12        b.   PPD officers arrested people who were not even protesting but doing things

13            as innocent as enjoying a late supper.

14        c.   PPD officers trapped arrested people for hours in poorly ventilated police

15            vehicles, while they choked on tear gas and pepper spray, denying them

16            hydration or waste relief.

17        d.   PPD officers, having arrested 124 people without probable cause and in

18            order to put them in jail, submitted affidavits of probable cause so deficient

19            that no reasonable officer would have done so, resulting in those cases

20            being dismissed <u>at the initial appearance</u>.

21      193.    Phoenix and Maricopa were aware of PPD's actions on the night of May

22  30, 2020, and specifically on notice of not just the excessive force, but also that PPD was

23  prosecuting people without probable cause.

a. Despite this actual knowledge, Phoenix did not reprimand, train, supervise, or otherwise investigate or address PPD's actions to charge protesters against racism without probable cause.

b. Defendant Williams, instead of addressing obvious deficiencies in the training or supervision of PPD, made a false public statement that the arrests of May 30, 2020 were lawful and appropriate, and that people were "there to commit crimes" or otherwise assist those criminals; despite that their only "crime" was protesting racially motivated murders, thereby ratifying the unconstitutional conduct of PPD.

194. Targeting, arresting, and prosecuting people who exercise their first amendment rights to speak out against white supremacy or in support of Black people, or that associate with people who do, is a longstanding practice or custom of Phoenix.

a. This longstanding practice or custom directly and proximately caused the constitutional violations complained of in this lawsuit against Phoenix and its employees as referenced above.

195. Conspiring with law enforcement to prosecute innocent people whose speech was disfavored by law enforcement is a longstanding practice or custom of Maricopa.

a. This longstanding practice or custom directly and proximately caused the constitutional violations complained of in this lawsuit against Maricopa and its employees as referenced above.

196.    As a direct and proximate result of these Defendants' policies and/or customs, the Plaintiffs were injured as described generally in this lawsuit, and are entitled to all available damages under the law.

### FIFTH-SEVENTH CLAIMS FOR RELIEF

**42 U.S.C. § 1983- Fourth Amendment False Arrest and Malicious Prosecution**
**42 U.S.C. § 1983- First Amendment Retaliation**

197.    At all times, each of the Individual Defendants were aware that targeting, arresting, and prosecuting people who exercise their first amendment rights to speak out against white supremacy or in support of Black people, or that associate with people who do, violates fundamental constitutional rights.

198.    Individual Defendants who are in supervisory roles were aware that:

   a.  Directing subordinates to target, arrest, and prosecute people who exercise their first amendment rights to speak out against white supremacy or in support of Black people, or that associate with people who do, is itself a violation of the constitution.

   b.  Knowing that subordinates are that targeting, arresting, and prosecuting people who exercise their first amendment rights to speak out against white supremacy or in support of Black people, or that associate with people who do, and failing to prevent those acts or to be deliberately indifferent to them are themselves violations of the constitution.

   c.  Disregarding known or obvious consequences that failing to appropriately act in response to subordinates who are targeting, arresting, and prosecuting people who exercise their first amendment rights to speak out against white supremacy or in support of Black people, or that associate with people who

do, would cause additional similar constitutional misconduct of subordinates, is itself a violation of the constitution.

d. Engaging in conduct showing a reckless or callous indifference to subordinates' targeting, arresting, and prosecuting people who exercise their first amendment rights to speak out against white supremacy or in support of Black people, or that associate with people who do, is itself a violation of the constitution.

*July 18, 2020*

199.   On or about July 18, 2020, PPD became aware of a demonstration that was to take place the next day at 6:00p.m. at Phoenix City Hall.

200.   The organizers of the demonstration had a publicly stated purpose of "working towards systemic change in policing." Upon this information, Plaintiffs allege that PPD believed that the content of the demonstration would be critical of law enforcement's actions against Black people.

201.   Due to the nature of the organization planning the event, Plaintiffs allege that PPD believed that attendees of the event to be held on July 18, 2020 had, at points in the past, spoken critically of law enforcement's actions against Black people.

202.   Prior to the start of the event, PPD specifically identified non-party Kristen Byrd and Plaintiff Ivy for arrest, based on their criticisms of law enforcement that had taken place on or about July 13, 2020 and July 15, 2020.

203.   Following the event, Defendants Herr, Lynch, Jurgenson, and Roberts effectuated an arrest of Plaintiff Christian, which was ordered by Defendants Moore and

1    Groat. Plaintiff Christian was thus accused of and charged with committing aggravated

2    assault against a police officer.

3            a.   Plaintiff Christian did not in any way, assault a police officer. Upon this

4                 information, Plaintiff Christian alleges that Defendants Moore and Groat

5                 did not believe that Plaintiff Christian committed this offense, however,

6                 because of Plaintiff Christian's protests against white supremacy and in

7                 support of Black people, these Defendants targeted Plaintiff Christian for

8                 arrest in order to suppress his constitutional rights, and to punish him for

9                 his use of those constitutional rights in the past.

10   204.   Following the event, Defendants Whitlock and Tinto effectuated an arrest

11   of Plaintiff Ivy, which was ordered by Defendants Moore and Groat. Plaintiff Ivy was

12   thus accused of and charged with obstructing a public thoroughfare.

13           a.   Plaintiff Ivy did not obstruct a public thoroughfare. Upon this information,

14                Plaintiff Ivy alleges that Defendants Moore and Groat did not believe that

15                Plaintiff Christian committed this offense, however, because of Plaintiff

16                Ivy's protests against white supremacy and in support of Black people,

17                these Defendants targeted Plaintiff Ivy for arrest in order to suppress his

18                constitutional rights, and to punish him for his use of those constitutional

19                rights in the past.

20                            ***August 9, 2020***

21   205.   On or about August 9, 2020, PPD became aware of a demonstration that

22   was to take place that evening in Phoenix.

23

77

206.    The demonstration was titled "Blue Silence March." Upon this information, Plaintiffs allege that PPD believed that the content of the demonstration would be critical of law enforcement's actions against Black people.

207.    Due to the title of the demonstration, Plaintiffs allege that PPD believed that attendees of the event to be held on August 9, 2020, had, at points in the past, spoken critically of law enforcement's actions against Black people.

208.    Upon information and belief, Defendant Sponsel participated in the investigation and targeting of those who have spoken critically of law enforcement's treatment of Black people, because prior to the Blue Silence March, she e-mailed Defendant Howell a document called a "Form IV."

  a.  "Form IV" is a fill in the blank statement of probable cause which would be filled in to successfully charge persons with "rioting."

  b.  On or about May 31, 2020, after 124 people were arrested for "riot," their charges were dropped at their initial appearances because the probable cause affidavits submitted to the court lacked any individually identifiable information. These allegations are discussed in the lawsuit *Sanchez, et al. v. City of Phoenix, et al.* 2:21-cv-00934-SMB-CDB.

  c.  Upon information and belief, following the dismissal of the criminal charges as detailed in *Sanchez*, Defendant Sponsel drafted Form IV in order to advise and work with PPD in the investigation and targeting for arrest, those who speak out against white supremacy or in support of Black people, thereby stripping her of absolute prosecutorial immunity.

209.     Prior to the start of the event, PPD specifically identified and had a meeting about Plaintiff Franks and the Blue Silence March. Upon information and belief, the subject of this meeting was to plan to arrest Plaintiff Franks due to his criticisms of law enforcement's actions against Black people that had been ongoing since Michael Brown, a Black man, was killed by police in Ferguson Missouri.

210.     During the entire course of the event, PPD maintained surveillance of Plaintiff Franks.

211.     At one point, several PPD officers in riot gear formed a "skirmish line" to confront the Blue Silence March.

212.     Several of the PPD officers in the skirmish line did not activate their body cameras, in direct violation of PPD policy and procedure. At least one PPD officer affirmatively refused to activate his body camera, even when Plaintiff Franks pointed out that it was not on. Upon this information Plaintiff Franks alleges that PPD officers planned to commit violence against the Blue Silence March participants.

213.     The skirmish line began approaching the Blue Silence March participants and began shoving them with riot shields.

a.   This action caused Plaintiffs Franks and Reed to become trapped between the skirmish line and large concrete planters and immediately upon Plaintiff Franks being trapped, a PPD officer, believed to be Defendant Moore, ordered his arrest.

i.   Defendant Schweikert pointed out Plaintiff Franks to the skirmish line, which then converged upon Plaintiff Franks. Upon this information, Plaintiff Franks alleges that he was specifically targeted

for arrest (effectuated by Defendant Moller upon Defendant Moore's order) for his prior criticisms of law enforcement's actions against Black people, thereby violating his First Amendment right to freedom of speech.

b. At around this same time, Plaintiffs Reed and Ivy were also arrested by Defendants Sticca and Zopf.

    i. At the time of their arrests, they were in close physical proximity to Plaintiff Franks. Upon this information, Plaintiffs Reed and Ivy allege that they were arrested for being in suspected association with Plaintiff Franks, thereby violating their First Amendment right to freedom of assembly.

c. At around this same time, Plaintiff Villa was also arrested by Defendants Lynch and Volk.

    i. At this time of his arrest, he was in close physical proximity to Plaintiff Franks. Upon this information, Plaintiff Villa alleges that he was arrested for being in suspected association with Plaintiff Franks, thereby violating his First Amendment right to freedom of assembly.

214. Following August 9, 2020, PPD worked to determine the identities of individuals who were present at the Blue Silence March, in order to retaliate against them for opposing white supremacy and police violence against Black people.

a. On or about August 10, 2020, Defendant Crowley arrested Plaintiff Shivley and falsely alleged that Plaintiff Shivley assaulted Defendant Cozad and tried to break into jail.

i. Upon this information, Plaintiff Shivley alleges that Defendant Cozad and Crowley conspired to retaliate against her for her exercise of first amendment rights to speak in opposition to police violence against Black people.

ii. Alternatively, Plaintiff Shivley alleges that Defendant Cozad falsely informed Defendant Crowley that Plaintiff Shivley assaulted him to retaliate against her for her exercise of first amendment rights to speak in opposition to police violence against Black people.

b. On or about August 23, 2020, Defendant Tinto falsely arrested Plaintiff Iniko.

c. On or about October 3, 2020, Defendants Arredondo and Thomas falsely arrested Plaintiff Christian.

*October 3, 2020*

215. On or about October 3, 2020, PPD conducted surveillance on individuals that they identified to be "leaders" of BLM.

a. Upon information and belief, PPD checked if Plaintiff Christian had "active warrants" and finding none, PPD assured that he was "occurring charges."

i. PPD then identified Plaintiff Christian as a candidate for the "standard five-packer for [August 9, 2020]" and for the false arrest to occur pursuant to "protocol we talked about."

ii. Upon information and belief, the "standard five-packer" referred to the five charges levied against the August 9, 2020 protesters

1. Plaintiff Christian did not commit any crimes on August 9,

2020. Upon this information, Plaintiff Christian alleges that PPD targeted him for protesting in support of Black people and against white supremacy on August 9, thereby violating his First Amendment right to freedom of speech.

    b. Upon information and belief, Plaintiff Tekola was identified as the "main leader [of BLM- Phoenix] metro group."

        i. An unknown PPD officer sent a photograph of Plaintiff Tekola to Defendant Moore.

            1. Upon information and belief, Defendant Moore was designated and recognized by PPD as "Alpha Leader."

        ii. PPD was to have "eyes" on Plaintiff Tekola at all times, as Defendant Moore had marked Plaintiff Tekola as "TARGET" for arrest.

216. Following the conclusion of the October 3, 2020 protest, upon the joint coordination of Defendants McBride, Moore, and Sponsel:

    a. Plaintiff Christian was falsely arrested by Defendants Arrendo and Thomas on Defendant Moore's order thereby violating his first amendment right to freedom of speech.

    b. Plaintiffs Acton, Johnson, and Tekola were falsely arrested by Defendants Whitlock Raymond, Ramos, Castillo-Williams, and Zopf thereby violating their first amendment rights to freedom of speech and association.

***October 17, 2020***

217. Upon information and belief, one of the purposes of the conspiracy between the Defendants was to prevent further First Amendment activities against needless police

violence against Black people was working; community members and organizations who had been active in earlier protests largely stopped engaging in First Amendment assemblies.

218.    On or about October 17, 2020 approximately fifteen (15) people, including but not limited to Plaintiffs Aderholdt, Austin, Bonelli, Gibson, Kaper, Leyva, and Llanes gathered at University Park near Van Buren Street and 10th Avenue. They were soon followed by Plaintiff Collins.

219.    PPD, believing that these people were or would speak out against police violence towards Black people, followed the group both on foot and in vehicles.

220.    At approximately 10:34p.m, Defendant Moore, called an unlawful assembly.

221.    Within approximately one (1) minute after the call of an unlawful assembly, an insufficient amount of time to allow the ordered dispersal to occur, Defendant Moore ordered a mass arrest of the protesters, which was accomplished by approximately 20 PPD officers surrounding the group and threatening force:

a.    Defendants Sticca, Turiano, Gates, and Tucker circled and arrested Plaintiffs Aderholdt and Austin and arrested them and charged them for crimes which they did not commit, thereby violating their first amendment rights to free speech.

b.    Defendants Bachorski, McBride, and Metcalf arrested Plaintiff Bonelli and charged him with crimes which he did not commit, thereby violating his first amendment rights to free speech.

c.    Defendant Hoelscher arrested Plaintiff Gibson and charged her with crimes

she did not commit thereby violating her first amendment rights to free speech.

d. Defendant McCombs arrested Plaintiff Kaper and charged her with crimes that she did not commit thereby violating her first amendment rights to free speech.

e. Defendant Merl arrested Plaintiff Leyva and charged her with crimes that she did not commit thereby violating her first amendment rights to free speech.

f. Defendant Beeks arrested Plaintiff Llanes and charged him with crimes that he did not commit thereby violating his first amendment rights to free speech.

g. Defendants Crowley, Volk, Herr, and Scott arrested Plaintiff Collins and charged him with crimes that he did not commit thereby violating his first amendment rights to free speech.

222. Upon information and belief, in a conversation between Defendants Moore and Sponsel immediately following the arrests described directly above, Defendant Sponsel helped Defendant Moore determine the best language to put in the charges and reports to be filed against these Plaintiffs via "Form IV" thereby forfeiting her absolute prosecutorial immunity.

223. Each of these Plaintiffs had the criminal litigation resolve in their favor as of July 9, 2021.

224. As a direct and proximate result of these actions by these Defendants, these Plaintiffs were injured by being arrested and prosecuted without probable cause and are entitled to all available damages under the law.

/ / /

## **EIGHTH CLAIM FOR RELIEF**

### **42 U.S.C. § 1983- Fourth Amendment Excessive Force**

225.    On or about October 3, 2020, Defendant Ramos without provocation or justification tackled Plaintiff Acton and threw her to the ground.

226.    After she was already handcuffed behind her back, Defendant Turiano without provocation or need, hit Plaintiff Acton in the face.

227.    Both Defendants:

    a.  Knew that the nature of the crime Plaintiff Acton supposedly committed was minor and non-violent.

    b.  Plaintiff Acton was not an immediate threat.

    c.  Plaintiff Acton was not actively resisting.

    d.  Plaintiff Acton was not trying to evade arrest.

    e.  Had sufficient time to deliberate and calculate whether or not to use force and were not forced to make a "split decision in the heat of the moment."

    f.  Rather than holding Plaintiff Acton's arm to control her, she was thrown to the ground and then while handcuffed behind her back, hit in the face.

    g.  The Defendants' violence against Plaintiff Acton were more culpable than Plaintiff Acton's actions.

    h.  Though there was opportunity to do so, the Defendants did not warn Plaintiff Acton that force was imminent.

228.    As a direct and proximate result of the Defendants' uses of force, Plaintiff Acton was injured and is entitled to all available damages under the law.

/ / /

## NINTH AND TENTH CLAIMS FOR RELIEF

### 42 U.S.C. § 1985(3)- Conspiracy to Deprive Civil Rights
### 42 U.S.C. § 1983- Fourth Amendment Fabricated Evidence

229.    Upon information and belief, in or around 2017, Phoenix (by way of PPD and its employees' conduct being ratified by Chief Williams through her public statements and refusal to discipline, train, or supervise) and Maricopa (by way of MCAO and its supervisory employees' direct conduct), at the behest of Phoenix and in specific contemplation of Maricopa's history of conspiring with law enforcement, entered into a durable agreement to retaliate against individuals who spoke out against white supremacy in policing, and in support of Black people.

230.    One or more conspirators took substantial steps in furtherance of the conspiracy when:

a. MCAO refused to add PPD officers assigned to the unit which uses a white supremacist challenge coin and who lied in police reports or in court into the Rule 15 database.

b. MCAO's Defendant Sponsel coordinated with PPD to more effectively mass arrest people demonstrating in opposition to white supremacy and in support of Black people by writing the majority of their probable cause statements so as to avoid a repeat of the May 30, 2020 dismissals, she created and distributed "Form IV" to the PPD.

c. On or about August 20, 2020, Defendant Michaud:

i. Fabricated evidence with Defendant Zamora that he later presented to the Grand Jury that Plaintiff Franks that he resisted arrest and assaulted officers.

86

ii.   Fabricated evidence with Defendant Hardy that he later presented to the Grand Jury that Plaintiff Christian "crossed over the barricade line" and "rush[ed] to get involved in preventing [Plaintiff Franks' August 3, 2020] arrest."

231.   Upon information and belief, as a continuation of the retaliation conspiracy hatched around 2017, on or about September 28, 2020, one or more of the MCAO Individual Defendants met with one or more of the PPD Defendants to develop a cohesive, yet illegal, "strategy" for all past and future cases involving protestors, as well as a protocol for effectuating false arrests and charges in order to dissuade individuals from exercising their constitutionally protected First Amendment rights, and to punish those who have exercised such rights, or were suspected to have done so, or who were expected to do so.

232.   In furtherance of the September 28, 2020 conspiracy to retaliate, on or about October 14, 2020, Defendant Sponsel met with one or more Individual MCAO Defendants as well as one or more Individual PPD Defendants for the specific purpose of discussing "law enforcement's response to protests." Immediately following that meeting, Defendants Michaud and Hardy brought cases against Plaintiffs Acton, Christian, Johnson, and Tekola to the Grand Jury.

233.   Defendant Sponsel discussed her intention to Defendants Sherry, Leckrone, and Goddard (who ratified and/or failed to prevent Defendant Sponsel's unconstitutional plan) to, in furtherance of the September 28, 2020 conspiracy, co-ordinate with PPD to fabricate evidence against the October 17, 2020 arrestees, including but not limited to Plaintiffs Aderholt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes, to therein, portray these Plaintiffs and others as members of a criminal street gang in order to

1    suppress First Amendment speech against white supremacy and in support of Black people.

2        234.   On or about October 14, 2020, Defendant Sponsel took a substantial step in

3    furtherance of the September 28, 2020 conspiracy to retaliate (which itself is a part of the

4    larger 2017 conspiracy to retaliate) when she advised a PPD "Task Force" (comprised of

5    officers who are members of the still existing unit that went unpunished, untrained, and

6    unsupervised despite their white supremacist affiliations) on "law enforcement's response

7    to protests."

8        235.   In furtherance of these conspiracies to retaliate, Defendants Sponsel and

9    Michaud caused the October 3, 2020 Plaintiffs to be criminally "joined" with the August

10   9, 2020 Plaintiffs. Upon information and belief, this joinder was part of the overarching

11   conspiracy as an attempt to group all of the protesters together in order to then classify the

12   protesters as a criminal street gang.

13       236.   In furtherance of the conspiracy to retaliate, Defendant Michaud:

14       a.   Fabricated evidence with Defendant Hardy that he later presented to the

15           Grand Jury that insinuated Plaintiff Christian was responsible for destroying

16           police barricades;

17       b.   Fabricated evidence with Defendant Hardy that he later presented to the

18           Grand Jury that Plaintiff Christian "crossed over the barricade line" to "join

19           the group" in front of PPD headquarters.

20       c.   Fabricated evidence with Defendant Hardy that he later presented to the

21           Grand Jury that Plaintiff Christian "rush[ed] in to get involved in preventing

22           [Plaintiff Franks' August 3, 2020] arrest."

23       d.   Fabricated evidence with Defendant Hardy that he later presented to the

Grand Jury that Plaintiff Christian "grabbed onto" a woman whom PPD was trying to arrest on August 9, 2020 and as a result the woman was able to escape arrest and be at large.

e. Fabricated evidence with Defendant Hardy that he later presented to the Grand Jury that Plaintiff Johnson assaulted an officer by "taking like a football lineman stance."

237. On or about October 17, 2020, additional steps in furtherance of the conspiracy were taken:

a. Defendants Lozoya and Segura "copy and pasted" all or parts of a narrative report against Plaintiffs Aderholt and Austin, that upon information and belied, was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest against police violence against Black people, and charge them with crimes irrespective of the individual actions of individual arrestees.

b. Defendant Metcalf "copy and pasted" all or parts of a narrative report against Plaintiff Bonelli, that upon information and belied, was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest against police violence against Black people, and charge them with crimes irrespective of the individual actions of individual arrestees.

c. Upon information and belief, Defendants Hoelscher and Coffey "copy and

pasted" all or parts of a narrative report against Plaintiff Gibson, that upon information and belied, was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest against police violence against Black people, and charge them with crimes irrespective of the individual actions of individual arrestees.

d.  Defendant Merl "copy and pasted" all or parts of a narrative report against Plaintiff Leyva, that upon information and belied, was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest against police violence against Black people, and charge them with crimes irrespective of the individual actions of individual arrestees.

e.  Defendant Beeks "copy and pasted" all or parts of a narrative report against Plaintiff Llanes, that upon information and belied, was pre-coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest against police violence against Black people, and charge them with crimes irrespective of the individual actions of individual arrestees.

f.  Defendant Williams-Castillo "copy and pasted" all or parts of a narrative report against Plaintiff Collins, that upon information and belied, was pre-

coordinated by PPD and MCAO, specifically, Defendants Moore, Groat, McBride, and Sponsel, and approved as part of their ongoing First Amendment conspiracy to arrest anyone in the area of a protest against police violence against Black people, and charge them with crimes irrespective of the individual actions of individual arrestees.

238. On or about October 23, 2020, Defendants Sponsel and Michaud met with one or more Individual PPD Defendants, including Defendant McBride, and they all specifically agreed, in order to suppress First Amendment speech against white supremacy and in support of Black people, to pretend a criminal street gang called "ACAB" existed and fabricate evidence that would later be presented to the Grand Jury that numerous protestors were members of the gang, including but not limited to Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes.

239. On October 27, 2020, in furtherance of these conspiracies to retaliate, Defendant Sponsel:

 a. Coordinated malicious prosecutions without probable cause against Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes to the Grand Jury, knowing that "ACAB" was a non-existent gang.

 b. Falsely advised the Grand Jury that Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes, were members of an "organization" and that this "organization" went downtown on October 17, 2021 "to participate in a riot."

 c. Misleadingly advised the Grand Jury that Defendant McBride as a "gang expert" to testify about gang history rather than disclosing Defendant

McBride as a fact witness that was personally involved with the events at issue before the Grand Jury.

d. Fabricated evidence with Defendants Raymond and McBride to which they later falsely testified against Plaintiffs Aderholt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes to the Grand Jury.

    i. Upon information and belief, Defendant Sponsel was aware of the substance of evidence to which Defendants Raymond and McBride were to testify (because upon information and belief, Defendant Sponsel pre-planned the testimony with these Defendants, thereby forfeiting her absolute immunity).

e. Fabricated evidence with Defendant McBride which he later presented to the Grand Jury that the individuals arrested on October 17, 2020 including but not limited to Plaintiffs Aderholt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes were members of a criminal street gang called "ACAB" that was similar to, and just as organized and violent as notorious gangs like the Crips, Bloods, Mexican Mafia, and Hells Angels;

    i. Upon information and belief, Defendant Sponsel was aware of the substance of evidence to which Defendant McBride was to testify (because upon information and belief, Defendant Sponsel pre-planned the testimony with these Defendants, thereby forfeiting her absolute immunity).

f. Fabricated evidence with Defendant McBride that he later presented to the Grand Jury that "[t]his group is specifically setting out almost on a weekly

basis to disrupt police, commit violent acts of aggravated assault against police, throw incendiary devices at police.  And they are talking about it, they are buying the equipment, they are bringing it to the gathering, and executing those plans."

     i.  Upon information and belief, Defendant Sponsel was aware of the substance of evidence to which Defendant McBride was to testify (because upon information and belief, Defendant Sponsel pre-planned the testimony with these Defendants, thereby forfeiting her absolute immunity).

g.  Fabricated evidence with Defendant McBride that he later presented to the Grand Jury that the ACAB criminal street gang whose members included Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes would sharpen their nails and modify umbrellas to use as weapons against police.

     i.  Upon information and belief, Defendant Sponsel was aware of the substance of evidence to which Defendant McBride was to testify (because upon information and belief, Defendant Sponsel pre-planned the testimony with these Defendants, thereby forfeiting her absolute immunity).

240.   In furtherance of these conspiracies, on or about October 31, 2020, Defendants Hunzinger and Scott attempted (but failed) to add Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes to "GangNet," a statewide database of purportedly verified gang members, falsely detailing that these Plaintiffs were members of

the ACAB gang, which even though no such gang existed nor were these Plaintiffs a member of any gang at all, these Defendants portrayed these Plaintiffs as members of this "extremist" organization with "violent tendencies."

241. On or about October 31, 2020, Defendants Van Dorn, Leckrone, and Sponsel (all members of MCAO Executive Leadership) met with Defendants Vick, Green, Livingston and Martin (members of the MCAO's Gang Division) to further facilitate past and plan future conspiratorial actions. Each of the people in this meeting knew that the evidnece regarding the ACAB gang was fabricated, and upon information and belief, one of the Defendants pointed out the illegal nature of this meeting, their plans for the future, and the attempted cover up of what they had already done; though ultimately, the "thin blue line" prevailed, and each of the persons in this meeting resolved to stand behind the fabricated ACAB evidence against Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes.

242. Defendant Adel communicated to the MCAO and the PPD that she was not supervising and would not supervise them, when she stated publicly on the sole basis of being told by the PPD and/or MCAO conspirators without further substantiation that:

    a. "[w]hile some will attempt to describe these defendants as 'protesters,' a grand jury found probable cause to charge this group with crimes, including the planning of violence" and

    b. "While [MCAO] fully support[s] the rights of everyone to exercise their first amendment rights, we will not allow violence to take over our streets."

243. Knowing that Defendant Adel was not supervising their actions or scrutinizing their statements, the conspirators were emboldened and the conspiracy

continued:

    a.  On or about November 3, 2020, MCAO Deputy County Attorney Derek Debus sent a congratulatory message to Defendant Sponsel regarding the Grand Jury's indictment of Plaintiffs Aderholdt, Austin, Bonelli, Collins, Gibson, Kaper, Leyva, and Llanes as a criminal street gang, ACAB.

    b.  Defendant Sponsel did not directly respond to Mr. Debus' message, rather she asked if he was on "Signal."

244.   Upon information and belief, including but not limited to Defendant Sponsel's statement to Mr. Debus that she and other MCAO personnel used Signal because of "[t]he disappearing messages feature," Signal allows users to send and receive individual and group messages that are encrypted and may automatically delete after a short period of time.

245.   Upon information and belief, the Defendants use Signal to hide their conspiratorial conversations, and to avoid public disclosure laws. Due to the Defendants' use of Signal, many pieces of evidence have been destroyed (which was the purpose and intent of the Defendants' use of this app).

246.   As of July 9, 2021, all of the prosecutions brought as referenced in this lawsuit were dismissed in favor of the Plaintiffs.

247.   As a direct and proximate result of these conspiracies, the Plaintiffs were injured and are entitled to all available damages under the law.

///

95

## ELEVENTH CLAIM FOR RELIEF
### Civil Conspiracy under Arizona Law

**(Plaintiffs Acton, Aderholdt, Bonelli, Christian, Collins, Franks, Gibson, Ivy, Johnson, Kaper, Leyva, Llanes, Reed, Tekola, Tice, and Valentin Against Defendants Maricopa County and City of Phoenix Only)**

248.    All other paragraphs of this Complaint are incorporated.

249.    As of July 9, 2021, all of the prosecutions brought as referenced in this lawsuit were dismissed in favor of the Plaintiffs.

250.    As a direct and proximate result of these conspiracies, the Plaintiffs were injured and are entitled to all available damages under the law.

251.    As set forth above, employees of the Defendants Maricopa County and City of Phoenix entered into a durable agreement to retaliate against individuals who spoke out against white supremacy in policing, and in support of Black people; thereby agreeing and/or conspiring to engage in the tort of malicious prosecution.

252.    As set forth above, employees of the Defendants Maricopa County and City of Phoenix agreed and/or conspired to engage in the tort of malicious prosecution by: targeting individuals for arrest based upon their political associations, activities, and beliefs; using pre-approved, fill-in-the-blank, cut-and-paste probable cause statements to support false felony charges against these individuals, manufacturing evidence via false reporting and testimony, and the presentation of false evidence to grand juries.

253.    These activities required mass coordination amongst the leadership at both Maricopa County and the City of Phoenix, and required the mass coordination of both line prosecutors and TRU/PPD officers.

254.    As a direct and proximate cause of this conspiracy, Plaintiffs were injured

96

and suffered other damages in an amount to be proven at individual damages trials.

255.    As set forth above, the Defendants Maricopa County and the City of Phoenix engaged in this conspiracy were acting in the course and scope of their employment as employees of either Maricopa County or the City of Phoenix, and Maricopa County and the City of Phoenix are therefore vicariously liable for the damages caused by their employees' conspiracy to engage in tortious conduct.

**TWELFTH CLAIM FOR RELIEF**
**Aiding & Abetting Under Arizona Law**

**(Plaintiffs Acton, Aderholdt, Bonelli, Christian, Collins, Franks, Gibson, Ivy, Johnson, Kaper, Leyva, Llanes, Reed, Tekola, Tice, and Valentin Against Defendants Maricopa County and City of Phoenix Only)**

256.   All other paragraphs of this lawsuit are incorporated.

257.   As set forth above employees of the Defendants Maricopa County and City of Phoenix agreed and/or conspired to engage in the torts of malicious prosecution by targeting individuals for arrest based upon their political associations, activities, and beliefs; using pre-approved, fill-in-the-blank, cut-and-paste probable cause statements to support false felony charges against these individuals, manufacturing evidence via false reporting and testimony, and the presentation of false evidence to grand juries.

258.   These activities required mass coordination amongst the leadership at both Maricopa County and the City of Phoenix, and required the mass coordination of both line prosecutors and TRU/PPD officers.

259.   Defendants Maricopa County and City of Phoenix Defendants knew that the above-referenced conduct of their employees constituted the torts of malicious prosecution.

260.   These employees of the Defendants Maricopa County and City of Phoenix

aided and abetted in the commission of the tort of malicious prosecution by authorizing, approving, acquiescing, directing, and/or directly participating in the tort's commission.

261.  As a direct and proximate cause of this misconduct Plaintiffs were injured and suffered other damages in an amount to be proven at individual damages trials.

262.  As set forth above, the employees of the Defendants Maricopa County and City of Phoenix engaged in this conspiracy were acting in the course and scope of their employment as employees of Maricopa County and the City of Phoenix, and Maricopa County and the City of Phoenix are therefore vicariously liable for the damages caused by their employees' aiding and abetting of tortious conduct.

### THIRTEENTH CLAIM FOR RELIEF
**Intentional Infliction of Emotional Distress**

**(Plaintiffs Acton, Aderholdt, Bonelli, Christian, Collins, Franks, Gibson, Ivy, Johnson, Kaper, Leyva, Llanes, Reed, Tekola, Tice, and Valentin Against Defendants Maricopa County and the City of Phoenix only)**

263.    All other paragraphs of this lawsuit are incorporated.

264.    As set forth above, employees the Defendants Maricopa County and City of Phoenix, acting in the course and scope of their employment, engaged in a series of acts that an average member of the community would regard as atrocious, intolerable in a civilized community, and beyond all possible bounds of decency.  In particular, employees of the Defendants Maricopa County and City of Phoenix caused Plaintiffs to be falsely and maliciously prosecuted for felony crimes they did not commit in an attempt to deter and/or punish their political speech.

265.    These employees of the Defendants Maricopa County and City of Phoenix either personally participated in these activities, acted jointly or conspired with others who

1  did so; authorized, acquiesced in, or set in motion policies, plans, or actions that led to the

2  unlawful conduct; failed to take action to prevent such unlawful conduct; failed to maintain

3  adequate training and supervision in deliberate indifference to Plaintiffs' rights; and ratified

4  unlawful conduct that occurred by agents and officers under their direction, supervision,

5  and control, including failing to take remedial or disciplinary action.

6       266.   The aforementioned conduct was intentional insofar as it intended to cause

7  Plaintiffs emotional distress (and discouraged them from participating in protected First

8  Amendment activities).

9       267.   The aforementioned conduct was reckless because those engaging in that the

10  employees of the Defendants Maricopa County and City of Phoenix were aware of and

11  consciously disregarded the near certainty that their actions would cause Plaintiffs

12  emotional distress.

13       268.   The aforementioned conduct did, indeed, cause Plaintiffs to suffer emotional

14  distress.

15       269.   As a direct and proximate result of these actions, Plaintiffs were injured and

16  suffered damages in an amount to be proven at individual damages trials.

17       270.   As set forth above, the employees of the Defendants Maricopa County and

18  City of Phoenix who intentional caused Plaintiffs emotional distress were acting in the

19  course and scope of their employment as employees of Maricopa County and the City of

20  Phoenix, and Maricopa County and the City of Phoenix are therefore vicariously liable for

21  the damages caused by their employees' tortious conduct.

22  

23  / / /

99

## FOURTEENTH CLAIM FOR RELIEF
### Invasion of Privacy – False Light under Arizona Law

**(Plaintiffs Acton, Aderholdt, Bonelli, Christian, Collins, Franks, Gibson, Ivy, Johnson, Kaper, Leyva, Llanes, Reed, Tekola, Tice, and Valentin Against Defendants Maricopa County and the City of Phoenix Only)**

271.    All other paragraphs of this lawsuit are incorporated.

272.    As set forth herein, employees of the Defendants Maricopa County and City of Phoenix, acting in the course and scope of their employment, made false and misleading public statements against Plaintiffs – namely that they had committed numerous felony crimes.

273.    The statements of these employees of the employees of the Defendants Maricopa County and City of Phoenix create a false impression about Plaintiffs, namely that they had committed numerous felonies.

274.    The impression created about Plaintiffs would be highly offensive to any reasonable person.

275.    The false and misleading statements caused Plaintiffs to be damaged and negatively impacted their community standing, professional reputation, emotional well-being, and mental health.

276.    At the time the false statement was made, employees of the Defendants Maricopa County and City of Phoenix either knew the statement would create a false impression of Plaintiffs or acted in reckless disregard of the fact that their statement would create a false impression of Plaintiffs.

277.    As set forth above, the employees of the Defendants Maricopa County and City of Phoenix engaged in this conspiracy were acting in the course and scope of their

employment as employees of Maricopa County and the City of Phoenix, and Maricopa County and the City of Phoenix are therefore vicariously liable for the damages caused by their aiding and abetting of tortious conduct.

### FIFTEENTH CLAIM FOR RELIEF
**Defamation Under Arizona Law**

**(Plaintiffs Acton, Aderholdt, Bonelli, Christian, Collins, Franks, Gibson, Ivy, Johnson, Kaper, Leyva, Llanes, Reed, Tekola, Tice, and Valentin Against Defendants Maricopa County Only)**

278.    All other paragraphs of this lawsuit are incorporated.

279.    As set forth herein, employees of the Defendants Maricopa County and City of Phoenix, acting in the course and scope of their employment, made defamatory statements of fact about Plaintiffs – namely that they had committed numerous felonies.

280.    These statements were false at the time it was made.

281.    The employees of the Defendants Maricopa County and City of Phoenix who made these false statements had actual knowledge that these statements was false at the time they were made.

282.    These false statements were published on each and every Plaintiff's Form IV Probable Cause statement – which is public record—and publicly reported by numerous media outlets.

283.    These statements caused Plaintiffs to be damaged and negatively impacted their community standing, reputation, emotional well-being, mental health, and financial stability.

284.    At the time the false statements were made, the employees of the Defendants Maricopa County and City of Phoenix either knew the statements were false, or they acted

in reckless disregard of their falsity.

285.   As set forth above, the employees of the Defendants Maricopa County and City of Phoenix who made these defamatory statements were acting in the course and scope of their employment as employees of Maricopa County and the City of Phoenix, and Maricopa County and the City of Phoenix are therefore vicariously liable for the damages caused by their employees' tortious conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendants as follows:

    a.  For compensatory damages (general and special) in an amount to compensate Plaintiffs fully and fairly for the violations of their Constitutional Rights;

    b.  For general, consequential, special, and compensatory damages, including but not limited to their pain and suffering, mental anguish, emotional suffering, and loss of enjoyment of life;

    c.  For nominal damages as provided for by law;

    d.  For punitive damages in an amount sufficient to punish defendants and deter them from similar unconstitutional and unlawful conduct in the future;

    e.  For prejudgment interest on all liquidated sums;

    f.  For attorneys' fees under 42 U.S.C. §§ 1983 and 1988;

    g.  For Plaintiff's costs and other expenses incurred in this action; and

    h.  Such other and further relief as the Court deems just.

DATED this 13th day of July, 2021.

THE PEOPLE'S LAW FIRM, PLC
645 North 4th Avenue, Suite A
Phoenix, Arizona  85003


By:  /s/ Stephen D. Benedetto
Stephen D. Benedetto
Heather Hamel
Will Knight

*Attorneys for Plaintiffs*